**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Milford E. COOK, Defendant-Appellant.**

**No. 26458.**

United States Court of Appeals,
Ninth Circuit.

Aug. 23, 1972.

As Amended on Denial of Rehearing
Sept. 28, 1972.

(SEE "NOTE" BELOW)

NOTE: Shortly after these majority and dissenting opinions were issued in slip sheet form, the Supreme Court of the United States handed down its opinion in Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed. 2d 568 (1973). We then recalled this court's judgment and remanded the cause to the District Court for reconsideration in the light of *Bronston*. The District Court did not disturb Cook's judgment of conviction, and a second appeal followed. On that appeal, we reversed Cook's conviction. 489 F.2d 286 (9th Cir. 1973). In that second, final decision, Judge Kilkenny, writing for the court, remarked that *Bronston* "essentially, tracked the reasoning previously set forth . . . ." in the dissenting opinion here published. We have therefore decided to direct the belated publication of the original opinions, believing that they, when reviewed in connection with *Bronston*, may be of some worth to those concerned with the law of perjury in the federal courts.

Thomas P. Keefe (argued), of Walthew, Warner & Keefe, Max R. Nicolai, of Nicolai, Montgomery & Sorrel, Emmet T. Walsh, Seattle, Wash., for defendant-appellant.

Douglas D. McBroom, Asst. U. S. Atty. (argued), Richard G. McBroom, Jr., Asst. U. S. Atty., Stan Pitkin, U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before ELY, WRIGHT and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Cook appeals from his conviction by a jury of perjury, charged to have been committed before a federal grand jury in violation of 18 U.S.C. § 1621.

The grand jury generally was investigating gambling and racketeering in Seattle, Washington, and, at the time Cook testified, specifically was concerned with an alleged system of payoffs and shakedown practices in which the Seattle Police Department had been involved. Cook, who had joined the police force in 1941, was an Assistant Chief of Police at the time of the grand jury's investigation, but he retired after the perjury indictment was filed.

The indictment charged that Cook had willfully given false testimony before the grand jury on February 25, 1970, when he testified in three particulars as follows:

"(a)

Q. Do you have any knowledge of law enforcement officers being paid by operators of gambling establishments?

A. No, I do not.

(b)

Q. You don't have any knowledge of anybody currently on the force who participated in shakedowns?

A. I do not.

(c)

Q. Have you at any time received any money, property, or thing of value from any person direct or indirect, who has been involved in gambling activities?

A. No."

At the conclusion of the government's case, the trial judge dismissed the charge, insofar as it included item (c), for lack of sufficient convicting evidence. Hence, only the charges involving items (a) and (b) were submitted to the jury, whose general verdict read, "We the jury find the Defendant guilty as charged in the indictment."

The prosecution established, in great volumes of direct testimony, that some policemen had taken payoffs from gambling establishments. The evidence with reference to Cook's knowledge of the payoffs was both direct and circumstantial. The appellee introduced testimony of business operators and owners who were victims of police shakedowns and of numerous policemen who participated in the payoff system. The system was described in detail, and the evidence leaves little room for doubt that there had been widespread corruption in the Seattle Police Department. Regarding Cook's alleged involvement, Police Major Jessup and Assistant Chief Fuller both testified that they discussed the existence and operation of the payoff system with Cook on separate occasions. Jessup also testified that he received monthly payments from Cook. Assistant Chief Corr testified that he had observed Cook surreptitiously receiving envelopes from others.

In defense, Cook produced a dozen officers or former officers who testified that they did not have any knowledge of policemen having been paid by gambling establishments and that they did not have any knowledge of officers currently on the force who had participated in shakedowns. In addition, Cook himself denied having had any personal knowledge of payoffs. Numerous character witnesses vouched for his veracity.

We shall discuss the assignments of error in the order outlined in appellant's brief.

### CONSTITUTIONAL CHALLENGE.

 We do not agree with Cook's argument that the questions upon which the charge is based are so "indefinite, vague, and ambiguous" as to require determination that the indictment itself is unconstitutionally vague. United States v. Marchisio, 344 F.2d 653, 661 (2d Cir. 1965). If there is vagueness in the term "any knowledge," such is necessarily inherent. Cf. Gebhard v. United States, 422 F.2d 281, 287–288 (9th Cir. 1970). We hold that the phrases "gambling establishment" and "being paid" are common phrases used in everyday conversational intercourse and are neither indefinite, vague, nor ambiguous.

In what might be considered a collateral attack on the sufficiency of the indictment, appellant contends that the questions and answers to Items (a) and (b) were lifted out of context, as a result of which his answers were given erroneous meaning. He points out that following (a) and prior to (b), the following interchange occurred:

"Q. Do you have any knowledge of any law enforcement officers taking shakedown money?

A. In my twenty-nine years' experience I have had *some knowledge that these things have existed and as a result the people that were involved were separated from the Police Department.*" (Emphasis supplied).

Likewise, he charges that the indictment also omitted the following testimony given by appellant at the hearing in response to a question by a grand juror:

"Grand Juror: And you heard no scuttlebutt flying about payoffs at any time in the Department that you can recall?

The Witness: Yes. Yes, I have heard all kinds of rumors and I have heard much gossip, but, none, when I say no involvement, I mean that the investigation in any case that I can recall, has been substantiated so far as these officers were concerned."

 The factual background in Brown v. United States, 245 F.2d 549, 556 (8th Cir. 1957), upon which appellant relies is not sufficiently close to require comment. The failure to insert the missing questions and answers in the indictment did not give the answers to (a) and (b) "a meaning wholly different" from that which is manifest when they are read in the light of the omitted questions and answers. As we shall later mention, the issue of appellant's "understanding" was for the jury and they resolved it against him. The indictment was not inadequate as a matter of law.

### SUFFICIENCY OF THE EVIDENCE

As quoted above, the first question set forth in the indictment made inquiry as to whether Cook possessed "any knowledge of law enforcement officers *being paid* by operators of gambling establishments." The question was asked on February 25, 1970. Cook argues that "being paid" refers to the present and that there was no evidence whatsoever that payments were being paid at or about the time of the inquiry. True enough, there is no evidence of payoffs after October 1, 1968. However, the question and answer must be read in the light of the nature of the investigation which was being conducted before the grand jury.

The record discloses that appellant was 56 years of age at the time of the trial in July, 1970. He graduated from an Oregon high school in June, 1930,

and for the next eleven years followed a variety of occupations. In 1941, he applied for a position with the Seattle Police Department and out of a group of 1200 applicants was selected in the top 50. He then took a thirteen week course in the Police Academy and was assigned to the traffic division of the police force. For the next two years, he was a patrolman and was then assigned to the motorcycle enforcement division. In 1947, he took and passed the examination for the position of sergeant, then attended Northwestern University Traffic Institute in Chicago for a period of five months. In 1950, he was promoted to Captain. His principal duties were in the traffic investigation division. Following a year and a half serving in that capacity and acting as an expert witness in traffic cases, he was promoted to Supervising Captain, in which capacity he served until August, 1956. In the meantime, in 1952, he had taken an examination for the position of Chief of Police and had finished third. In 1956, he was named Chief of the Patrol Division. After a variety of assignments, he was appointed Chief of the Detective Division in 1965, and six months later was assigned to the position of Assistant Chief of Police. The primary responsibility of the Assistant Chief was to command the Patrol Division, in which capacity his major function was to supervise. In December, 1969, he was named Assistant Chief in charge of the Tactical Services Bureau.

■ Reading the record of appellant's testimony before the grand jury and at the trial, convinces us that appellant is a person of ordinary intelligence, at the very least, and probably, of superior intellect. We are convinced that he was fully and completely informed as to the nature of the grand jury hearing and knew, beyond question, that the grand jury was inquiring into police payoffs during the period some years prior to the grand jury inquiry in January and February, 1970.[1] Faced with this rec-

1. "MR. PITKIN: It is my duty to advise you that this is the Federal Grand Jury for the Western District of Washington inquiring into federal violations generally within the Western District, and also into organized criminal activity and any protection and payoff system that has existed."

\* \* \* \* \*

"Q. Would you outline for this Grand Jury the so-called tolerance policy, as you understand it?

A. Yes, sir. There is a tolerance policy in practically every phase of enforcement. As you, I am sure, are aware, it is impossible to enforce every law to its ultimate. Take the speed law, for instance, on a street where the speed is 30 miles an hour. We do not enforce it at 31 miles an hour. I myself drive to work on a 30-mile an hour street and the average speed on that street is 35 miles an hour, and no tickets are given. There is a level of enforcement in every area. You are interested in gambling, of course, and in this area the level of enforcement is set by the mayor, city council, and probably basically by the people of the community, and what they insist is the level of enforcement that they want. This is as I understand it."

\* \* \* \* \*

"Q. *What was the policy with particular reference to pinballs and cardrooms, private clubs, punchboards, bingo raffles? Would you run down through the thing?*

A. *Well, the policy that is presently, or was in existence until a short while ago, has been in existence as far as I can remember all through my career, and I am told that it was in existence prior to that time. There have been slight changes in it. The policy as it was interpreted to me was that those areas in which the council and the mayor saw fit to license by ordinance that we be permitted to operate at a level at which they did not cause serious concern to the citizens of the community.*"

\* \* \* \* \*

"Q. So that the amount that is a serious loss would depend on the financial abilities of the loser?

A. Quite often, yes. We, of course, have other interpretations of that policy— or the policy is broader than that. Of course, to gamble in your own home, to play penny ante, poker, or to play bridge for a quarter of a cent a point or a tenth of a cent a point, this is gambling, of course, too, and in those areas, although they are not licensed, of course, we believe that it would be unreasonable to try to take enforcement action and we just don't have that many police officers. And

ord, appellant is in no position to say that he misunderstood the question and thought it was referring to the present, rather than the past. His long experience in the Police Department and over-all demonstrated intelligence, precludes any misunderstanding as to the meaning of the indicated questions.

Appellant's contention that he may have misunderstood the question is strikingly similar to one urged by the appellant and resolved against him in

Vitello v. United States, 425 F.2d 416, 420–421 (9th Cir. 1970), cert. denied 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50 (1970). Here, as distinguished from United States v. Lattimore, 127 F.Supp. 405 (D.D.C.1955), aff'd 98 U.S.App.D.C. 77, 232 F.2d 334 (1955) and United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967), the appellant, in the context of the other questions propounded to him before the grand jury, could not have misunderstood the question. At

it applies in many, many areas. Everyone who plays golf, generally plays for some sum of money and it is not serious, no one is damaged by this, and so we don't try to enforce it. We couldn't possibly do it.

Q. What role, if any, do you play in implementing the tolerance policy, making it function?

A. At the present time, none.
Q. What have you in the past?
A. I have tried to interpret it."

\* \* \* \* \*

"Q. Did you ever receive any specific instructions from anyone regarding the tolerance policy, namely, the mayor, the chief, council, in other words, directed to do a particular thing with regard to the tolerance policy?

A. I have been told to see that places were policed and they were supervised as much as we possibly could with the man-power that was available, that we policed them as well as we could and that in some instances I was told that some particular operations should cease their operations.

Q. Do you have any knowledge of public officials being paid for their position in favor of a tolerance policy?

A. No, I do not.
Q. *Do you have any knowledge of law enforcement officers being paid by operators of gambling establishments?*
A. *No, I do not.*

Q. Do you have any knowledge of any law enforcement officer taking shake down money?

A. In my twenty-nine years' experience I have had some knowledge that these things have existed and as a result the people that were involved were separated from the Police Department.

Q. You don't have any knowledge of anybody currently on the force who participated in shake downs?

A. I do not.

Q. By shake down, do you know exactly what I mean?

A. Yes.

Q. Explain it for the Grand Jury what the term means?

A. Well, there is two types of shake downs. And I presume that the one you are talking about is where you threaten a person with some police action unless you are paid a certain sum, or if you receive something. This is one type of shake down. And the other type, of course, is the shake down for weapons and that, which has no connotation of any wrongdoing.

Q. Have you accepted any money from the operator of a gambling establishment?

A. I have not.

Q. Have you ever accepted any money indirectly through intermediaries from the operator of a gambling establishment?

A. I have not. Let me tell you something, Mr. Pitkin. This gambling policy which we are speaking was well publicized, everybody knew, everybody in this town knew exactly the level at which they could operate. The public knew. It was well publicized in the newspapers, and there was nothing for a policeman to sell.

Q. The policy would change from time to time, would it not?

A. No. Not really. *In my experience it has been pretty much the same.* . . ."

\* \* \* \* \*

"Q. It has been well known by management of the Police Department that the tolerance policy is a violation of state law, is that not correct?

A. Yes. The same as speeding is, also, you know.

Q. And the policy has at times been interrupted over the years, is that not correct?

A. Yes."

\* \* \* \* \*

[Grand Jury Transcript, Exhibit 1, pp. 114, 116, 117, 118, 119, 120, 121]. (Emphasis supplied).

least, the issue on misunderstanding would be for the jury. The court carefully instructed the jury that one of the essential elements of the crime of perjury was proof by the government, beyond a reasonable doubt, that the testimony before the grand jury was false, and that such testimony was willfully given with specific intent to do something which the law forbids. The resolution of the issue was properly left to the jury. Essentially, the same type of issue was decided adversely to the appellant's contention in Vitello v. United States, *supra*. Needless to say, we are guided by the rule that on appeal the evidence must be viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Wilson, 447 F.2d 1, 3 (9th Cir. 1971); Kay v. United States, 421 F.2d 1007, 1010 (9th Cir. 1970). Additionally, all the reasonable inferences supporting the verdict are in favor of the government. Diaz-Rosendo v. United States, 357 F.2d 124, 129 (9th Cir. 1966), cert. denied 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966).

We note that the trial judge patiently instructed the jury as to the elements of the crime of perjury which had to be proven beyond a reasonable doubt before arriving at a guilty verdict. We also note that the judge just as carefully instructed the jury that they could find the appellant guilty or innocent on both items or could find appellant guilty on one item and not guilty on another. Similarly, he told the jury that before returning a verdict of guilty each juror had to agree thereto and that the verdict had to be unanimous. True enough, the judge did not separate the items in telling the jury that its verdict must be unanimous.

The comprehensive instructions of the judge consumed 26 pages of the transcript. The members were told, among other things, not to single out one instruction, but to consider the instructions as a whole. Pointedly similar in-

structions were before us in Vitello v. United States, *supra*, 425 F.2d p. 422, where we said, "Implicit in the instructions is a direction to the members of the jury that they could not return a verdict of guilty unless they were unanimous on one or more of the charges of falsity specified in the indictment. Under any reasonable rule of interpretation or construction applied to the instructions, the jury was told that appellant must be acquitted unless the government proved beyond a reasonable doubt to the entire jury that the appellant was guilty of perjury on at least one of the three charges set forth in the indictment." We shall later mention the authorities which require us to assume that the jury followed the instructions. In this case, if the jury performed its duty as stated in the instructions, it was required to be unanimous on the appellant's guilt. Under the instructions, the only manner in which the jury could arrive at an unanimous verdict was to find guilt beyond a reasonable doubt on one or more of the two items. Vitello resolves this issue against appellant.

### MATERIALITY ISSUE

Next, appellant contends that the trial court erred in instructing the jury on the subject of materiality. The trial judge held, as a matter of law, that the questions (a) and (b) were material to the subjects under investigation by the grand jury. Appellant suggests that the issue of materiality should have been submitted to the jury. This question was before us in Vitello v. United States, *supra*, pp. 423–424, and resolved against appellant. *Cf.* United States v. Tyrone, 451 F.2d 16 (9th Cir. 1971). Along the same line, appellant charges that the government completely failed to discharge its burden of proving materiality. The transcripts of the grand jury proceedings were before the trial court and are now before us. These transcripts make it crystal clear that the grand jury was making a general inves-

tigation into gambling and racketeering in Seattle, Washington, and at the time appellant testified it was specifically concerned with an alleged system of pay-offs and shakedown practices in which the Seattle Police Department had been involved. The procedure employed by the court is approved in Vitello v. United States, *supra*, as well as in United States v. Alu, 246 F.2d 29 (2d Cir. 1957). All that can be said of Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929) and Bowers v. United States, 92 U.S.App.D.C. 79, 202 F.2d 447 (1953), cited by appellant, is that they hold that materiality must be proved. Our review of the grand jury transcripts convinces us that the questions (a) and (b) were material to the scope of the grand jury investigation.

The fact that the grand jury testimony in *Vitello* was accompanied by a stipulation that the transcript was to be accepted as true, is of no particular significance. Here, each of the grand jury transcripts is certified to by the court reporter, thus giving authenticity to the material examined *in camera* by the court. Additionally, Exhibit 1, a portion of the grand jury proceedings, is sufficient in itself to establish the materiality of questions (a) and (b) to the scope of the grand jury investigation.

In passing, we note that appellant failed to take an exception to the instruction on materiality as required by

Rule 30, F.R.Crim.P. This failure, in itself, would preclude us from considering this contention.

## HEARSAY TESTIMONY

During the course of the trial, the court conditionally admitted certain hearsay testimony as to out-of-court statements and directives of other officers of the Seattle Police Department. Although the jury was cautioned again and again to disregard such hearsay, the appellant relying upon Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and similar cases, argues that the cautionary instructions given to the jury before the conditional admission of hearsay and the later striking of the testimony "could not wipe clean the tarnished image of the defendant." We disagree.

■ On the occasions of the conditional admission of the hearsay, in each instance, the jury was cautioned and warned that the statements might later be stricken and should not be considered until the court eventually ruled on whether the hearsay was properly before them. Time after time during the course of the trial, the court warned the jury to disregard any hearsay testimony to which an objection had been taken. Later, in his final instructions the court repeatedly cautioned and warned the jury to disregard the hearsay.[2]

2. "During the course of the trial the Court has constantly warned you to disregard any hearsay testimony that has been objected to. I did strike some, as you recall, a substantial amount, there was some, you heard it and it was stricken.

Now, I would remind you once again that hearsay testimony, that is, the statement of a witness as to what some third party has said is not considered to be evidence.

Now, also hearsay, I mean a written document may be hearsay unless it is admitted under some exception. So, generally speaking, hearsay is what someone testifies to that someone else said, not what the witness himself said, he may testify what he said, but not the response. That is hearsay.

I have previously advised you that hearsay testimony, which I conditionally

allowed to be presented to you under the so-called Conspiracy Rule exception to the Hearsay Rule, was to be disregarded.

Now, specifically, the testimony includes narrations of Major Jessup regarding conversations with Chief Moore, Chief Lyle LaPointe, the narration of Chief Fuller regarding his conversations with Sergeant Buher, and Chief Gustin's narration of his conversation with LaPointe.

Now, also the little card that was read from, but it was stricken, that has to be completely disregarded, anything that you may recall that was read or interpreted by the witness from that card.

Now, you are to disregard the testimony relating to these matters completely, and they should in no way be given consideration in your deliberations."

[T. pp. 2079–2080].

*Krulewitch* is not in point. It did not involve stricken hearsay testimony, much less repeated warnings by the court that the jury should not consider the hearsay which had been stricken. Appellant's other cases are no more in point. Under the circumstances of this case and, in particular, in the light of the court's repeated instructions to disregard the hearsay evidence, we are required to assume that the jury followed the instructions and did not willfully disobey them. Vitello v. United States, *supra,* 425 F.2d p. 421; United States v. Friedman, 445 F.2d 1076, 1083 (9th Cir. 1971).

## INSTRUCTION ON RIGHT OF APPEAL

■ Next, appellant argues that the trial court should not have told the jury that, "If the defendant is guilty, there can always be an appeal" or that, "The Court can make an error, those errors are usually corrected by an appellate court if they have been damaging in any way." While we do not approve the giving of such instructions, United States v. Workman, 454 F.2d 1124, 1129 (9th Cir. 1972), appellant is in no position to complain. It is well settled in this circuit that if an objection is not made at the time that we will not invoke the plain error provisions of Rule 52(b), F.R.Crim.P., except in the very exceptional situation wherein it appears to be necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process. United States v. Bacall, 443 F.2d 1050, 1063 (9th Cir. 1971); Marshall v. United States, 409 F.2d 925, 927 (9th Cir. 1969). Here, we do not believe that the remarks of the court resulted in a miscarriage of justice or, in any manner, invaded the integrity or reputation of the judicial process. It is a general principle that counsel cannot remain si-

lent, interpose no objection, and after verdict raise for the first time a claim that comments were improper and prejudicial. United States v. Cozzetti, 441 F. 2d 344, 352 (9th Cir. 1971); Ignacio v. People of Territory of Guam, 413 F.2d 513, 520–521 (9th Cir. 1969), cert. denied 397 U.S. 943, 90 S.Ct. 959, 25 L. Ed.2d 124 (1970). True enough, these cases involved remarks by counsel, rather than the court. In the circumstances presented, we find no logical reason why the rule should not be applied to the court's remarks. United States v. Workman, *supra,* 454 F.2d pp. 1124, 1127; United States v. Allen, 431 F.2d 712, 713 (9th Cir. 1970); Duran v. United States, 413 F.2d 596, 600 (9th Cir. 1969); Carroll v. United States, 326 F. 2d 72, 82 (9th Cir. 1963).

## EMPLOYMENT OF GEBHARD RULE

■ Traditionally, because of a need to encourage potential witnesses to testify freely and willingly, witnesses have been afforded protection from unfounded perjury prosecutions by the imposition of a more stringent requirement of proof commonly known as the "two witness rule".[2a] For example, Weiler v. United States, 323 U.S. 606, 608–609, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Properly stated, the rule is that the uncorroborated oath of one witness is not enough to establish, for the purposes of conviction of perjury, the falsity of sworn testimony. Recently, our court recognized the practical difficulty of proving perjury under the traditional rule when the alleged falsity was lodged in the belief, memory or knowledge of the accused and permitted proof of guilt in such cases by circumstantial evidence. Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970). The judge here in-

---

**2a.** The rule has now been abolished by 18 U.S.C. § 1623(a), (e). See United States v. Clizer, 464 F.2d 121 (C.A.9, 1972).

structed the jury in accordance with the law as stated in *Gebhard*.[3]

Appellant argues: (1) that we overrule *Gebhard* and hold that circumstantial evidence of knowledge is insufficient, or (2) that we distinguish *Gebhard* by saying that the indictment there before the court included 32 different counts, while here, we have one count with two items and that the court indiscriminately applied the so-called two witness rule and the circumstantial evidence rule to both items. We decline the invitation to overrule *Gebhard* and confess our inability to distinguish it on the grounds urged by counsel. Here, the court in its instructions made it abundantly clear that the crime stated in Item (a) was entirely separate and distinct from that stated in Item (b). Likewise, the court emphasized that the *Gebhard* circumstantial evidence rule applied only to the charge in Item (a), in which the issue of knowledge was presented. The court's *Gebhard* instruction is not vulnerable to attack.

## KNOWLEDGE INSTRUCTION

 Appellant quibbles about the failure of the court to give his requested instruction on "knowledge". The court's instruction on knowledge consisted of 20 lines and over 110 words. The instruction, in our view, adequately covered everything requested in appellant's request. While the language of the last paragraph of the instruction might be more precisely employed, we feel that when it is read in context with the other instructions on the same subject, it measures up to the requirements stated in United States v. Lattimore, *supra*. In any event, appellant's requested instruction is no more enlightening than that

given by the court. Besides that, appellant failed to object to that portion of the instructions of which he now complains. Rule 30, F.R.Crim.P., precludes him from now asserting error.

We suspect that Brother Ely's continuing assault on the probity of circumstantial evidence as stated in United States v. Nelson, 419 F.2d 1237 (9th Cir. 1969), is again reflected in the views so dramatically expressed in his exhaustive dissent. See United States v. Brown, 454 F.2d 397, 399 (9th Cir. 1972). Beyond question, *Nelson* precluded the trial judge from giving certain of the instructions requested by appellant.

Our review of the record convinces us that the appellant had a fair trial and that the judgment of the trial court must be affirmed.

It is so ordered.

ELY, Circuit Judge (dissenting):

I respectfully dissent. While my Brothers and I disagree on numerous specific issues, my principal difficulty with the majority opinion concerns its approach which, as I see it, is insensitive to the delicate nature of a perjury prosecution and dangerously unrestrictive of the pervasive impact of Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970). By isolating each of Cook's contentions without regard to its inherent relationship with the others, my Brothers issue an opinion that is fraught with distressing inconsistencies.

A perjury trial is not an ordinary criminal prosecution. The crime is unique in that perjury, unlike offenses such as robbery, arson, or murder, lacks an objectively demonstrable *actus reus*. Since the gravamen of the offense lies in the calculating utterance of testimony

3. "Therefore, you are instructed that in cases such as this when it is alleged that the falsity is in the knowledge of the accused, the law is that such alleged falsity in knowledge, that is, the subjective falsity of the statements, may be proved by circumstantial evidence alone, that is, the two witnesses or one witness and corroborative evidence rule does not

apply to the state of the defendant's mind, provided such evidence is sufficient to produce conviction in your minds of such falsity beyond a reasonable doubt upon all the evidence in the case and in accordance, of course, with the other instructions I have given you."
[T., pp. 2074–2075].

known by the actor to be false, the elements of *actus reus* and *mens rea* converge in a prosecution that focuses solely upon the person and character of the accused. This uniqueness has been recognized by the courts in fashioning rules of law peculiar to perjury prosecutions.[1] The time-honored application of the "two witness rule," for example, has shrouded perjury trials with an aura of solemnity exceeded only by prosecutions for treason, the only other modern crime in which a quantitative rule of evidence is applied. *See* Weiler v. United States, 323 U.S. 606, 608–609, 65 S.Ct. 548, 89 L.Ed. 495 (1945); 7 Wigmore on Evidence §§ 2036–2041 (3d ed. 1940).

Cook was not accorded the full benefit of the protection generally afforded by the "two witness" rule, however, because this case was submitted to the jury in accordance with the recently announced holding of our court in Gebhard, *supra*, permitting proof of the subjective falsity of allegedly perjured statements by circumstantial evidence. While *Gebhard* adequately indicates *when* the traditional "two witness" rule will give way to allow proof of perjury by circumstantial evidence, that case does not explicitly explain the *effect* of so relaxing the proof requirement. The pervasive impact of *Gebhard* upon the whole trial cannot be overlooked. If the circumstantial evidence offered by the prosecution in this trial were excised from the record, the

transcript, in all probability, would shrink to less than one-half of its present 2,000 pages. While I recognize the pragmatic reasons leading to our adoption of the circumstantial evidence rule in *Gebhard,* I cannot believe that the *Gebhard* court intended to impinge upon the traditionally exalted rights of one accused of perjury by sanctioning that alternate mode of proof. The clearest indication of the lack of any such intention appears in *Gebhard* itself, for the court there, upon its own initiative, enlarged upon the rights of one accused of perjury, extending protection to the interrogation stage of the proceedings and imposing restraint on the Government in framing an indictment. *See* 422 F.2d at 289–290.[2]

The teaching of *Gebhard,* therefore, is that the relaxation of the strict proof requirement is to be offset by increased vigilance on the part of the courts and the imposition of higher scruples on the prosecution. These measures are necessary to guard against the temptation to erode other safeguards erected for the protection of one accused of perjury, under the guise of merely facilitating proof of the offense. Unfortunately, I fear that my Brothers have fallen prey to that temptation, for my review of the record convinces me that, despite extremely conscientious efforts on the part of the trial judge, Cook did not receive a fair trial.[3]

1. Two of these rules that are directly applicable to the present case are the rule prohibiting lifting an allegedly perjurious statement of the accused out of its immediate context, and the prohibition against an interrogator's "bludgeoning" a witness who is suspected of giving perjurious responses, both of which are discussed in Part II, *infra*.

2. When Congress recently abolished the application of the "two witness" rule in certain situations (18 U.S.C. § 1623(e)), it provided another safeguard against unwarranted prosecutions for perjury, *i. e.,* the privilege of recantation. 18 U.S.C. § 1623(d).

3. The trial judge's attempt to conduct the trial in a dignified manner was thwarted by the prosecution's utilization of Cook's case as the device for exposing the payoff

system. The sensationalism thus injected into this trial by the Government created an unwholesome atmosphere wholly inconsistent with the exacting standards attendant to the trial of a charge of perjury in the federal courts. While the prosecution may have proceeded in the utmost good faith, it is clear, as the district judge ultimately recognized, that its bounds were overstepped. This presented problems which, despite the court's best efforts, were irremediable. Cook, like any other accused, was entitled to the calm and dispassionate judgment of jurors uninfluenced by inadmissible testimony or other improper considerations. *See, e. g.,* Part VIII, *infra.*

The district judge, to some extent, at least, apparently shares some of my doubts about the validity of Cook's convic-

I shall discuss my intense disagreement with the majority opinion under separate headings.

## I. AMBIGUITY IN THE INDICTMENT.

The majority recognizes that the term "any knowledge" is vague, and the trial court's attempted definition of the phrase indicates the variety of meanings to which the expression may be subjected.[4] Moreover, as I discuss in greater detail below,[5] the question set forth as item (a) of the indictment is so ambiguous that Cook could have been subjected to this prosecution regardless of his response to that query.

I do not think it proper to indict and prosecute an individual for perjury when the questions forming the basis of the charge are so vaguely and inarticulately phrased *by the interrogator* as to require the jury to probe the inner workings of the accused's mind to seek to ascertain which of several plausible meanings he attributed to the ambiguous inquiries when he gave the allegedly perjurious responses. The patent vagueness of the present indictment, therefore, does present a defect of constitutional dimension.

"When elements in an indictment are so easily subject to divergent in-

terpretation, the accused is not adequately apprised of the charges as to enable him to prepare a defense. It therefore fails to conform to the requirements of the Sixth Amendment and Federal Rules [Rule 7(c), Fed.R. Crim.P.]."

United States v. Lattimore, 127 F.Supp. 405, 410–411 (D.D.C.), aff'd, 98 U.S. App.D.C. 77, 232 F.2d 334 (1955) (footnotes omitted). *See also* Vitello v. United States, 425 F.2d 416, 425 (9th Cir.) (dissenting opinion), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50 (1970).

## II. LIFTING STATEMENTS OUT OF CONTEXT.

A careful review of the record and relevant decisions convinces me that either there is merit in Cook's contention concerning the lifting of his statements out of context or the majority has implicitly overruled that portion of Gebhard v. United States, 422 F.2d 281, 289–290 (9th Cir. 1970), wherein our court condemned the practice of bludgeoning "a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts."

The majority recognizes the well established rule that "a charge of perjury may not be sustained by the device of

---

tion. During the proceedings on Cook's motion for a new trial, he remarked:

"Now these other alleged errors, and I think some of them may have been erroneous, some rulings of the Court, and there may have been some misconduct. I don't think it was intentional on the part of counsel."

\* \* \* \* \*

". . . I certainly would think that this would be a case that I hope would be reviewed by the Court of Appeals because it does present some problems . . . . ."

4. The court instructed the jury:

"As you know, this charge here involved alleged knowledge on the part of the defendant, or the issue is whether or not he had knowledge.

"Now, the term 'knowledge' may have different meanings when it is used in different contexts. 'Knowledge' as it is

generally used may mean acquaintance, understanding, or awareness of the facts or the truth. It includes information as to a fact, a clear perception of the truth, a firm belief, informing, an impression of the mind, the state of being aware.

"So, as you will note, it isn't a fixed term. On the other hand, the term knowledge is sometimes used to mean 'personal knowledge'. In that case it means knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay.

"You know what you see; you know what you hear. That is direct knowledge. Whether what you hear is true or not is another matter, but you know what you hear and see, presumably, if you are in a normal condition."

5. See text following note 10, in Part II, *infra.*

lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." Fotie v. United States, 137 F.2d 831, 842 (8th Cir. 1943); *accord,* Van Liew v. United States, 321 F.2d 674, 677–678 (5th Cir. 1963); Brown v. United States, 245 F. 2d 549, 556 (8th Cir. 1957); United States v. Geller, 154 F.Supp. 727, 730 n. 3 (S.D.N.Y.1957); *cf.* United States v. Norris, 300 U.S. 564, 576, 57 S.Ct. 535, 81 L.Ed. 808 (1937).

I strongly disagree with the holding of the majority that this rule is inapplicable to the present case. While I recognize that the facts of the subject case are distinguishable from those of one of the cases in which the "out of context" rule was applied, Brown v. United States, *supra,* I do not believe that that circumstance suffices as a reason for refusing to apply the rule here. For when the application of the standard in other cases is examined, it becomes obvious that the purpose of the rule would be furthered by applying it to the facts before us. For example, in Van Liew v. United States, *supra,* the court concluded that when a question and answer in the indictment were read in context, the testimony of the accused would have to be construed as referring to a single phase of a manufacturing process, not to the entire process as the Government had there attempted to establish by lifting the question and answer out of context. Likewise, when Cook's allegedly perjurious statements are read in context with the remainder of his testimony before the grand jury, it is evident that he did not deny "any knowledge" whatsoever, of the illicit practices. He forthrightly admitted in testimony omitted from the indictment, that he had acquired "some knowledge" and had heard "rumors" and "gossip" concerning police involvement in the payoff system.

Unlike my Brothers, therefore, I perceive a material difference between an apparently unqualified denial of "any knowledge," and a denial coupled with an explanation of the extent of one's "knowledge." In the present case, the defectiveness in the indictment is all the more egregious in light of the misdirection of the jury as to the manner in which the term "knowledge" should be interpreted.[6]

What is even more disturbing to me, however, is that the majority, in reaching its conclusion, seems to ignore the effect of its decision on this court's prior holding in Gebhard v. United States, 422 F.2d 281, 289–290 (9th Cir. 1970). During the grand jury proceedings, Cook was asked a sequence of three questions:

"Q. Do you have any knowledge of law enforcement officers being paid by operators of gambling establishments?

A. No, I do not.

Q. Do you have any knowledge of any law enforcement officers taking shakedown money?

A. In my twenty-nine years' experience I have had some knowledge that these things have existed and as a result the people that were involved were separated from the Police Department.

Q. You don't have any knowledge of anybody currently on the force who participated in shakedowns?

A. I do not."

As I read these queries they are redundant. The first and second questions are, for all practical purposes, identical. In addition, the third question merely asks Cook to repeat his previous response. In the indictment, however, Cook was charged with having committed perjury only with respect to the first and third of his responses.

While I realize that it is not our function to question the Government's motives in framing an indictment, I can perceive of no valid reason why the sec-

ond question and answer were deleted from the indictment here.

"[I]t is better practice, both from the standpoint of the Government and the defendant, to set forth enough of the testimony immediately before and after the alleged false statements to give some coherent context to the alleged false statements."

Stassi v. United States, 401 F.2d 259, 262 (5th Cir. 1968).

It would be utterly unreasonable to assume that the Government felt that Cook had not perjured himself with respect to the omitted testimony, since it was entirely consistent with the other responses for which he was indicted. It is more likely that the Government was concerned that the inclusion of this question and answer in the indictment would weaken its case by giving a different connotation to the questions and answers that were included in the indictment. Yet if this were so, then my above conclusion as to the applicability of the "out of context" rule could not logically be challenged. Assuming, *arguendo*, that the majority has properly concluded that Cook's statements were not improperly lifted out of context, then the only possible remaining explanation for the omission of the intervening exchange is that the Government framed the indictment so as to avoid the appearance of attempting to circumvent Gebhard v. United States, *supra*. If that consideration did motivate the Government, then, I submit, only the majority has been hoodwinked:

"[T]here is a defect . . . which appears on the face of the indictment. . . . [W]e do not think it proper that the government bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts."

*Id.*, at 289–290.

*Gebhard* makes it clear that the mere *asking* of repetitive questions is the practice condemned. While a distinction could be urged that the Government in *Gebhard* was only precluded from premising additional counts of perjury upon reiterated or rephrased questions, I do not believe that the evident error in this case can be avoided by the Government's action in omitting one offending question from the indictment and charging Cook in only one count of perjury. The *Gebhard* court emphasized that the damage this rule is designed to prevent occurs when an interrogator is allowed to hammer away at a witness, "thus creating more *possible* perjury counts," necessarily enabling the prosecution to choose the most detrimental responses to identical questions as the bases for a charge of perjury.

The "bludgeoning" prohibition, therefore, is not unlike the "out of context" rule.[7] Both proscriptions are directed at insuring that allegedly perjurious statements included within an indictment accurately reflect the testimony of the accused. This objective, in my opinion, has not been accomplished in the present case. The questions included in the indictment reflect a perversion of both Cook's testimony and the interrogation process; hence, I would hold that the indictment is defective.

## III. SUFFICIENCY OF THE EVIDENCE.

The first question set forth in the indictment made inquiry as to whether Cook possessed "any knowledge of law enforcement officers *being paid* by operators of gambling establishments." Cook was asked this question on February 25, 1970. Yet there was no evidence whatsoever that the alleged payments were being made at or about that time. To the contrary, the record very clearly establishes, and the majority appears to

---

7. In fact, the bludgeoning prohibition could be viewed as an extension of the "out of context" rule to the interrogation stage of the proceedings. In essence, this portion of *Gebhard* imposes the same type of restraint upon an interrogator in his questioning of a prospective perjury defendant as *Fotie* imposes upon the Government in framing a perjury indictment.

recognize, that the payments had ceased approximately two years before the critical question was asked.

If as Cook contends, the participial phrase "being paid" must be construed as referring to an ongoing activity, then the evidence was insufficient to support Cook's conviction on the basis of the question and answer first specified in the indictment. In light of the following authoritative definition and explanation of participial usage, I must agree with Cook:

"par'ti.ci.ple . . . *Gram.* A word that partakes of the nature of both verb and adjective; a verbal adjective, modifying a noun, but sharing the adjuncts and construction of the verb from which it is derived. The English verb has two participles: (1) the *present,* ending in *-ing* (hastily *writing* it down, he paused); (2) the *perfect,* ending for the most part in *-ed, -d, -t, -en,* or *-n* (I saw the note *written* and *posted*). These tense forms refer to the *state* of the action or occurrence as in progress or complete, rather than to its *time of happening,* which depends on the time expressed by the verb of the clause it occurs in (he climbed the stairs, *smiling* to himself,—in which sentence *smiling* refers to the same time as *climbed*). English participles and their phrases show the following characteristic distinctions of time reference and voice:

| TIME DISTINCTIONS | | ACTIVE VOICE | PASSIVE VOICE |
|---|---|---|---|
| Present | (*progressive* | writing | being written |
| | (*perfect* | arrived | written |
| Past | (*progressive* | ......... | ......... |
| | (*perfect* | having written | having been written |
| Perfect progressive | | having been writing" | |

Webster's New International Dictionary 1782 (2d ed. 1940).

Since it is virtually impossible to determine from the jury's general verdict whether Cook's conviction was based upon either item (a) or item (b) of the indictment, or both, Cook is entitled to a new trial. *See* Yates v. United States, 354 U.S. 298, 311–312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Vitello v. United States, 425 F.2d 416, 419 (9th Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50 (1970).

As I read the majority opinion, three theories are relied upon to refute my conclusion. First, the majority makes the somewhat astounding assertions that, in light of the nature of the grand jury investigation, the disputed question should be viewed as an inquiry into past events, and that because of his "superior intellect," Cook "is in no position to say that he *misunderstood* the question and thought it was referring to the present" (emphasis added). If, as my Brothers contend, the question must be read in context to ascertain its true meaning, then it would seem obvious that the query was improperly lifted out of context and given a wholly different meaning when it was included in the indictment. This inconsistency is a minor consideration for, as even a standard dictionary demonstrates, the only proper interpretation of question (a) is that it constitutes an inquiry into events in progress at the time it was asked. The use of the participial phrase "being paid" in conjunction with the verb "have" reveals that the interrogator could only have been eliciting Cook's knowledge concerning payments that were being made on or about February 25, 1970. The interrogator revealed in his other questioning that he was sufficiently familiar with English grammar to articulate inquiries into past transactions properly and unambiguously in the past tense.[8] In addition, several of the questions posed to Cook did inquire as to his knowledge concerning present practices, and these queries were phrased correctly

---

8. "What *was* the policy with particular reference to pinballs and cardrooms, private clubs, punchboards, bingo raffles? Would you run down through the thing?" (Emphasis added.)
* * * * *

"*Did* you *ever* receive any specific instructions from anyone regarding the tolerance policy, namely, the mayor, the chief, council, in other words, *directed* to do a particular thing with regard to the tolerance policy?" (Emphasis added.)

in the present tense.[9] Hence, it is only if Cook "misunderstood" the question that he could have considered it an inquiry into past events.

Perhaps the most persuasive indication of the indefensibility of the majority's position is the simple fact that had Cook responded to the question in the affirmative, there could have been no doubt, in light of the uncontroverted evidence that the payments had ceased, that such an answer would have been false. Cook was indeed "up the creek" without any semblance of a paddle when posed this question, for regardless of his response, he was subjecting himself to a perjury prosecution. I would not be surprised to find the majority's opinion cited in the future as authority for the proposition that an unequivocal "yes" or "no" response to any question in the course of grand jury proceedings presents a jury question as to the perjurious nature of the reply.

I cannot join the majority's distortion of the English language, nor can I conceal my concern over what I view as a lack of recognition of the unique nature of the offense of perjury. If there be any "misunderstanding" as to the meaning of the phrase "being paid," it is one shared only by the interrogator, the Government, and the majority. I cannot uphold a conviction for perjury which was quite likely premised upon the Government agent's lack of "knowledge" concerning proper English usage.[10]

I am equally troubled by the majority's second basis for its inexplicable conclusion that no reversible error occurred, i.e., that the issue of Cook's misunderstanding was, in any event, for the jury to resolve. My principal objection to that theory is that I can not believe that the disputed phrase is susceptible to being interpreted as merely an inarticulate inquiry into past events. However, even if I were willing to join in the speculation that "being paid" could be so construed, I could not alter my conclusion as to the sufficiency of the evidence. The burden was on the prosecution, and it did not, and apparently could not, produce adequate evidence that Cook interpreted the question in a manner inconsistent with proper English usage.

"In a case where the question propounded admits of several plausible meanings, the defendant's belief cannot be adequately tested and it is nec-

---

9. The following interchange best exemplifies the interrogator's facility in this regard:

"Q. What role, if any, do you play in implementing the tolerance policy, making it function?
A. At the present time, none.
Q. What have you in the past?
A. I have tried to interpret it."

10. While the record in this case provides ample basis for a belief that Cook was somehow implicated in the payoff system, it is not our function as appellate judges to punish him for a crime with which he was not charged. Our consideration is to be confined to the crime charged to have been committed in the indictment. I do not believe the majority has properly exercised its function when it "convicts" Cook for a mistake made by the interrogator. The disposition of Cook's appeal has led me to reflect upon the tenets so articulately expressed by Mr. Justice Frankfurter:

"[I]t may not be amiss to remind that the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts."

Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946).

"From presuming too often all errors to to be 'prejudicial,' the judicial pendulum need not swing to presuming all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its corrective process is, after all, guilty. In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

326 U.S. at 615, 66 S.Ct. at 406.

essary to determine what the question meant to him when he gave the disputed answer. United States v. Lattimore, 127 F.Supp. 405 (D.C.D.C. 1955), aff'd, 98 U.S.App.D.C. 77, 232 F.2d 334 (1955).

"There was no evidence to show what the question meant to Mrs. Wall when she answered it. In the absence of such evidence, no determination could be made as to the falsity of her answer. The evidence was insufficient to support the conviction. The District Court erred in denying the motion for judgment of acquittal."

United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967). Hence, a jury question had never properly matured.

The majority, therefore, cannot seriously contend that the prosecution's evidence was sufficient to support Cook's conviction with respect to item (a) of the indictment. Apparently recognizing the dearth of reason supporting the two theories discussed above, my Brothers advance a third ground for rejecting Cook's contention—the applicability of Vitello v. United States, 425 F.2d 416 (9th Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 43, 27 L.Ed.2d 50 (1970).

The relationship between Vitello and Cook's claim concerning the sufficiency of the prosecution's evidence is not readily apparent. The nexus becomes evident, however, when the following language from Vitello is examined:

"In Yates, the court submitted to the jury two overt acts, including an overt act which had been barred by the California statute of limitations. Since there was no way of knowing whether the jury based its verdict upon the barred act, or the other alternative, the Supreme Court reversed.

"For the purposes of this decision, we accept appellant's view of the effect of Yates, and that the teaching of that decision should be here applied if we find (1) that there was insufficient evidence to be submitted to the jury on any one or more of the specifications of falsity. . . . "

425 F.2d at 419. The majority, therefore, seems compelled to hold the evidence sufficient with respect to item (a) so that it can invoke the holding in Vitello, concerning the jury's supposed prowess at divining the correct rule of law from nonexistent instructions, to cure the obvious error specified by the majority as the trial court's failure to "separate the items in telling the jury that its verdict must be unanimous." I see the utilization of two unsound theories as a weak foundation for the majority's application of the Vitello holding.

I harbor a more fundamental objection to the majority's application of Vitello to the present case. While I still entertain my doubts concerning the correctness of the reasoning employed by my Brothers in Vitello, see 425 F.2d at 425–426 (dissenting opinion), I recognize that I am bound by the decision of the majority in that case. Nonetheless, I am convinced that our present case is significantly distinguishable from Vitello.

My Brothers are most surely aware that we here have a somewhat unique situation for a perjury case. They recognize that the indictment is permeated with ambiguity and that the prosecution's case was based primarily upon circumstantial evidence. The true significance of these factors has, however, been overlooked by the majority. Since these factors have hitherto been considered by our court only in isolation, compare Vitello v. United States, supra (ambiguity in indictment), with Gebhard v. United States, supra (circumstantial evidence rule), their confluence here obviously sets Cook's case apart from other perjury trials that we have reviewed.

The importance of recognizing the impact of the Gebhard circumstantial evidence rule is easily demonstrated. When a unanimous panel of this court adopted the circumstantial evidence rule in Gebhard, it apparently recognized that substantial rights of the accused had been impaired thereby, and thus proceeded to fashion the aforementioned

"bludgeoning" prohibition. I reemphasize the fact that when Congress recently abrogated the traditional "two witness" rule as previously applied in some circumstances, it too was careful to afford countervailing protection to a perjury suspect by prescribing the defense of recantation. *See* note 2, *supra.*

Since, as I demonstrate in Part VI, *infra,* my Brothers misconstrue the applicability of the *Gebhard* circumstantial evidence rule in the one instance in which they discuss it, it is understandable that they would also incorrectly characterize my concern over the impact of *Gebhard* on Cook's trial as an "assault on the probity of circumstantial evidence." I do not, and logically could not, object to Cook's being deprived of the full benefit of the "two witness" rule. Nor do I question the reliability of the circumstantial evidence offered by the Government. I merely think it is important to recognize that *Gebhard* represents a departure from the traditional method of proof allowed in a perjury case, and that in cases in which *Gebhard* applies, we are under a duty, as exemplified by the prior actions of our court and the Congress, zealously to protect the accused's remaining rights.

We need not go so far as the court in *Gebhard* or the Congress. We need only strictly enforce Cook's right that his guilt should be determined by unanimous agreement of the jurors. On the record before us, there is no indication that Cook was so convicted, for, as the majority recognizes, "the judge did not separate the items in telling the jury that its verdict must be unanimous." Neither the court's instructions nor the general form of the jury's verdict excludes the possibility that Cook's conviction resulted from an impermissible "combination of jurors' opinions." Vitello v. United States, *supra* at 426 (dissenting opinion). The majority's only response to my conclusion is the speculation that the jurors must have been unanimous in light of the prior holding in *Vitello.* Yet Cook's trial differs substantially from Vitello's in that the degree of precision afforded by adherence to the "two witness" rule was here lacking. I believe that *Gebhard* commands us to insure that a similar degree of precision pervades all perjury trials, whether or not the "two witness" rule is applied. Cook's conviction should be reversed, if for no other reason, because of the deficiency in the court's instructions concerning required juror unanimity.

## IV. HEARSAY TESTIMONY.

Cook has catalogued numerous examples of hearsay evidence which were admitted over objection, the most damaging of which, ultimately stricken, were admitted conditionally for the limited purpose of showing a conspiracy in the police department to maintain the payoff system. The trial court concluded, however, that no conspiracy had been proved, and thus instructed the jurors to disregard the inadmissible testimony.

I strongly disagree with the majority's determination that Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), is not applicable. The observations of Mr. Justice Jackson concerning the "conspiracy" offense, *id.* at 445–448, 69 S.Ct. 716 (concurring opinion), are especially apposite in the context of the instant case—a perjury trial under *Gebhard, supra,* wherein the accused, lacking the mantle of protection generally afforded him by the "two witness" rule, is confronted with damaging hearsay evidence, admitted under an unsupportable theory of conspiracy. In my opinion, the injection of "conspiracy" into Cook's trial is a factor which must be considered in assessing the prejudicial effect of this testimony.

I also deem it significant that portions of the inadmissible testimony are present in the testimony of Fuller, Jessup, and Corr, who were among the few prosecution witnesses to testify as to direct dealings with Cook that would tend to implicate him in the payoff system. The trial court did not read the stricken

testimony to the jury because of his fear that such action would "aggravate" the situation with respect to that evidence; [11] hence, I believe the majority's assumption that the jury could sift through the mass of testimony and "forget" the hearsay portions is wholly unwarranted.

I am therefore unable to agree with my Brothers that the trial court's instructions to disregard this virulent testimony were sufficient to accomplish that goal. The testimony was simply too pervasive, and the resultant prejudice to Cook too damaging for the harm to be obliterated by any number of instructions. *See, e. g.,* Odom v. United States, 377 F.2d 853, 859–860 (5th Cir. 1967).

## V. INSTRUCTIONS ON RIGHT OF APPEAL.

The majority has quoted portions of the statements by the trial judge wherein he delineated the parties' respective rights to appeal, and intimated that any errors could be cured by an appellate court.[12] Under normal circumstances, I would agree with the majority that these remarks, when read in context, do not rise to the level of "plain error." Rule 52(b), Fed.R.Crim.Proc. As I have repeatedly emphasized, however, this is not a "normal" case.

In light of the serious nature of the offense of perjury and the peculiar cir-

cumstances of the present prosecution, I believe we must recognize that these remarks do impinge upon "the integrity and reputation of the judicial process." *See* People v. Morse, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964), cited with approval in United States v. Workman, 454 F.2d 1124, 1129 (9th Cir. 1972).

Hence, the effect of these admittedly improper remarks, when considered in cumulation with the other irregularities occurring throughout Cook's trial, cannot be so lightly dismissed.

## VI. EMPLOYMENT OF GEBHARD RULE.

Assuming, *arguendo,* that it was proper to submit this case to the jury, then I accept the majority's determination that the trial court correctly instructed the jury, in accordance with Gebhard v. United States, 422 F.2d 281 (9th Cir. 1970), that the subjective falsity of Cook's testimony could be proved by circumstantial evidence. I deem it necessary, however, to correct a statement made by the majority as to the applicability of that rule. That incorrect statement is that the trial judge instructed the jury "that the *Gebhard* circumstantial evidence rule applied only to the charge in Item (a), in which the issue of knowledge was presented." My review of the instructions, however, reveals no such limitation on the rule's

---

11. When discussing with counsel the instructions that would thereafter be given to the jury, the trial judge expressed his concern over the damage this testimony had wrought, and indicated that he would not reread the stricken testimony to the jury.

12. When the trial judge was addressing the panel of prospective jurors he went to great lengths to explain to them the functions of the court and the jury. While explaining the court's duty to rule on objections to evidence, he stated, "It is always important, particularly to the Government, to protect the record from prejudicial error because if the defendant is found not guilty, there is no review; if the defendant is guilty, there can always be an appeal."

At the close of the trial, in his final instructions to the jury, the trial judge again referred to the availability of appellate review:

"During the course of the trial it ultimately becomes the duty of counsel to make objections and for the Court to rule on them in accordance with the law, and the Court can make an error, those errors are usually corrected by an appellate Court if they have been damaging in any way.

"The jury should not be influenced in any way by the Court's ruling as to any evidence, and you shouldn't draw any inference from the fact that the question was put."

applicability.[13] The trial court did limit the circumstantial evidence rule to proof of the subjective falsity of Cook's allegedly perjured statements. It did not, and properly could not, limit the rule to item (a) because both item (a) and item (b) inquired as to Cook's "knowledge." If *Gebhard* were not applicable to item (b), there would have been no evidence to support Cook's conviction on that question and answer, and we would be required to reverse under Yates v. United States, *supra*.

## VII. KNOWLEDGE INSTRUCTION.

Before delving into the myriad defects in that portion of the majority opinion pertaining to the "knowledge" instruction, I deem it necessary to set forth Cook's contentions concerning the instruction and the proper disposition of those claims.

Cook quarrels with the trial court's definition of the term "knowledge." While I entertain grave doubts as to the propriety of basing a charge of perjury upon a word with so many varied meanings,[14] I find no impropriety in the trial court's defining the term to encompass both belief and direct, or personal, knowledge since the word obviously is susceptible to either interpretation.

Cook also challenges the test of guilt included within the "knowledge" instruction:

"It is your role as jurors in this case to read the Grand Jury testimony of the defendant, determine from the context of the questions and answers given there *how the Government intended to use the term 'knowledge'*, determine whether the defendant understood what the Government was asking, and then determine whether defendant willfully perjured himself." (Emphasis added.)

I am deeply troubled by the trial court's framing the test of guilt with reference to the interrogator's intended use of the term "knowledge" in the queries forming the basis for the charge, especially when no evidence was presented as to "how the Government intended to use the term. . . ."

The perjury statute itself, clearly formulates a "defendant's viewpoint" test of guilt: "Whoever, having taken an oath . . . that he will testify . . . truly, . . . willfully and contrary to such oath states . . . any material matter *which he does not believe to be true,* is guilty of perjury. . . ." 18 U.S.C. § 1621 (emphasis added). Furthermore, there is abundant judicial authority recognizing that the

---

13. The trial judge clearly explained to the jury the distinctions between, and the applicability of, the two rules applicable to the Government's burden of proof in this case:

"Now, the objective falsity of the statements must, as I say, must be established in conformity with the 'two witnesses' rule, which is peculiar to perjury prosecutions, and bear in mind that perjury requires a higher measure of proof than the usual criminal offense.

\* \* \* \* \*

"To continue with the evidence that pertains particularly to knowledge, the alleged falsity of this case is in the knowledge of the accused, and knowledge can rarely be established by any means other than through circumstantial evidence. While witnesses may see and hear and so be able to give direct evidence of what a defendant does or

fails to do, of course, there can be no eye witness account of the state of mind of the defendant as to what knowledge he possessed.

"Therefore, you are instructed that in cases such as this when it is alleged that the falsity is in the knowledge of the accused, the law is that such alleged falsity in knowledge, that is, the subjective falsity of the statements, may be proved by circumstantial evidence alone, that is, the two witnesses or one witness and corroborative evidence rule does not apply to the state of the defendant's mind, provided such evidence is sufficient to produce conviction in your minds of such falsity beyond a reasonable doubt upon all the evidence in the case and in accordance, of course, with the other instructions I have given you."

14. See Part I, *supra*.

crucial inquiry in a perjury case is whether the accused believed his testimony to be true in light of the meaning that *he,* not his interrogator, attributed to the questions and answers. *See, e. g.,* United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967); United States v. Winter, 348 F.2d 204, 210 (2d Cir.), *cert. denied,* 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); Seymour v. United States, 77 F.2d 577, 582 (8th Cir. 1935); United States v. Lattimore, 127 F.Supp. 405, 408 (D.D.C.), *aff'd,* 98 U.S.App.D.C. 77, 232 F.2d 334 (1955); *cf.* United States v. Hagarty, 388 F.2d 713, 716 n. 2 (7th Cir. 1968); Van Liew v. United States, 321 F.2d 674, 679 (5th Cir. 1963); Fotie v. United States, 137 F.2d 831, 840, 842 (8th Cir. 1943).

This portion of the court's charge to the jury, therefore, is legally incorrect because it formulates a test of guilt inconsistent with the legal standard prescribed by the statute and the cases decided thereunder. Moreover, there can be no doubt as to the misleading nature of this instruction. The expression "any knowledge" might well have conveyed one meaning to Cook and another to the interrogator. Yet Cook would not be guilty of perjury under Section 1621, even assuming he knew how the interrogator intended to use the term, if he answered the question truthfully according to his own interpretation of the inquiry.

At the trial, in fact, Cook's principal ground of defense was that he construed the queries as eliciting his "personal knowledge" of the matters about which he was questioned, whereas the prosecution contended that the question could not be interpreted in that limited fashion. Under the instruction given by the trial court, however, the jury was not permitted to accept Cook's theory of the case.[15] While I recognize that the jurors would be free to disbelieve Cook's assertions as to his interpretation of "any knowledge," and thus find him guilty of perjury as charged in the indictment, I do not believe that it should be presumed that they would have taken that course of action had they been given a legally correct instruction as to the test of guilt under Section 1621.

Since this case turns wholly upon the subjective state of mind of Cook, and since we permit proof of this inherently vague and ambiguous charge by circum-

---

15. Under the instruction given, the jury was foreclosed from determining whether Cook's response was, in fact, premised upon his avowed interpretation of the term "any knowledge." For example, the jury might have concluded that the interrogator intended to use the term "knowledge" to encompass "belief" as well as direct knowledge. If the jury also concluded that Cook understood that the term could have been so used, then, as I read the instruction, the jury would have been required to find Cook guilty.

It is not inconceivable that an individual possessing Cook's superior intellectual capacity would have recognized the ambiguity in the term "any knowledge." Hence, while Cook might well have understood how the interrogator intended to use these words, he may still have answered the question truthfully according to the interpretation he ascribed as bet-

ter fitting the phrase. Yet the jurors were not allowed to determine whether Cook did interpret the question in such a manner, and, hence, they could not accept his primary ground of defense, even if they fully believed his testimony.

I do not mean, of course, to imply any belief that the jury accepted Cook's testimony. I only wish to point out that under the imperfect instruction, the jury could have believed Cook's version of the facts, and still would have been compelled to find him guilty. Even though the possibility of prejudice inuring to Cook from this misleading instruction is speculative, Cook was nonetheless entitled to have his guilt ascertained "by a jury under *appropriate* judicial guidance, *however cumbersome* that process may be." Bollenbach v. United States, 326 U.S. 607, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946) (emphasis added).

stantial evidence, I firmly believe that the instructions to the jury should have made it perfectly clear that Cook's guilt or innocence was to be determined with reference to *his* construction of the questions.

Prior to the trial court's submission of the case to the jury, Cook requested that the trial court give an instruction which was in substantial conformity to the legally accepted test of guilt.[16] In addition, Cook specifically objected to the defective portion of the court's "knowledge" instruction, specifying the particular defect therein, in full compliance with Rule 30, Fed.R.Crim.Proc.[17] Hence, this issue is properly before us, and, as I understand the appellate function, we are bound to give it full consideration.

As concisely stated by the Supreme Court, the guiding principle controlling the disposition of this contention is "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." Bollenbach v. United States, 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

Yet *Bollenbach* does not require the reversal of every conviction following a trial in which the jury has been given an incorrect or misleading instruction. Implicit within the above quotation are the two limitations attending application of the rule: (1) In determining whether a conviction could be said to "rest upon" an improper instruction, the instructions must be read as a whole. *See, e. g.,* Howard v. United States, 128 U.S.App. D.C. 336, 389 F.2d 287, 291 (1967); Cohen v. United States, 378 F.2d 751, 755 (9th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967). (2) The defective instruction must relate to "a basic issue" in the case.

I have thoroughly reviewed the trial court's entire charge to the jury and I can find no other instruction tending either to cure or to neutralize the highly prejudicial effect of the offending in-

---

16. Cook's Supplementary Requested Instruction Number 2 read as follows:

"You are instructed that to sustain a conviction for perjury the burden is upon the government to establish by substantial evidence, excluding every other hypothesis than that of guilt, the essential elements of the crime charged. Perjury is the wilful, knowing and corrupt giving, under oath, of false testimony material to the issue or point of inquiry. An essential element is that the defendant must have acted with a criminal intent—he must have believed that what he swore to was false and he must have had the intent to deceive. If there was a lack of consciousness of the nature of the statement made or it was inadvertently made or there was a mistake of the import, there was not corrupt motive."

This language is almost a direct quotation from United States v. Rose, 215 F.2d 617, 622–623 (3d Cir. 1954), which was cited as authority for the requested instruction, as was Van Liew v. United States, 321 F.2d 674, 679 (5th Cir. 1963).

17. "With respect to the Court's failure to give requested supplemental instruction Number 2 [*supra* note 17], we object on the grounds and for the reason that relative to the use of the word 'knowledge' as defined by the Court, this particular instruction would have clarified it to the jury and made it less confusing as to the import of the particular word used.

\*　　\*　　\*　　\*　　\*

"And then in the Court's instruction relative to the third paragraph in the definition of 'knowledge', your Honor, we would object to the Court giving that particular instruction based upon the cases set forth in the defendant's trial brief which refer to the Fotie case, Fotie versus the United States in 137 Fed.2d, and also Brown versus the United States, 245 Fed.2d.

"That portion of the instruction allows the jury to determine from the context of the question and the answers given how the government intended to use the term 'knowledge' and determine whether the defendant understood the government was asking what was meant by the word 'knowledge.' "

struction. On the other hand, I reiterate that Cook did propose an instruction stating the correct rule of law and that he also drew the trial court's attention to the defective instruction.

Furthermore, the record in this case reveals that Cook's interpretation of the term "knowledge" was not merely "a basic issue," but the paramount issue in this case. Cook's defense rested almost entirely upon the ground that he interpreted the questions as inquiring into his "personal knowledge." It is obvious, therefore, that the rule of *Bollenbach* applies with full force to the present action. Moreover, it should be noted that in the analogous situation presented in Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945), the Supreme Court, even without the benefit of its subsequent decision in *Bollenbach,* did not hesitate to reverse a perjury conviction that *may have been* premised upon an incorrect instruction to the jury. In response to the Government's contention in *Weiler,* that the trial court's failure to instruct the jury in accordance with the "two witness" rule did not prejudice defendant because the record indicated that the rule had been satisfied, the Court stated,

> "The jury convicted without being instructed that more than the testimony of a single witness was required to justify their verdict. This was no mere 'technical' error relating to the 'formalities and minutiae' of the trial. Bruno v. United States, *supra* [308 U. S. 287, 293, 294, 60 S.Ct. 198, 200, 84 L.Ed. 257]. We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of jus-

tice, juries alone have been entrusted with that responsibility."

323 U.S. at 611, 65 S.Ct. at 551.

Both the Supreme Court [18] and our own court [19] have staunchly adhered to the principles announced in *Weiler* and *Bollenbach.* I can perceive of no valid reason to cast them aside here. I would therefore hold that because of the erroneous standard of guilt included within the "knowledge" instruction, Cook is entitled to a new trial.

The defects in the majority's analysis of this issue should be patent. I cannot understand how the instruction given by the trial judge "measures up to" the defendant's viewpoint test of guilt followed in United States v. Lattimore, 127 F.Supp. 405, 408 (D.D.C.), aff'd, 98 U. S.App.D.C. 77, 232 F.2d 334 (1955). Furthermore, the record conclusively demonstrates that Cook's requested instructions were, to use some of the majority's language, far "more enlightening than that given by the court" because Cook's proffered charge correctly stated the applicable law. Finally, I pass the majority's suggestion that the length of an instruction may serve as a basis for ascertaining its validity. Surely, such a suggestion does not warrant an extended analytical reply.

## VIII. CONCLUSION.

As the foregoing discussion indicates, many of the faults in the majority opinion are attributable to its analysis of each of Cook's separate contentions, isolated from the others. Perhaps the clearest example of the dangers inherent in this mode of analysis is seen from the majority's conflicting approaches in respect to the assumed operation of the jury.

18. *E. g.,* Yates v. United States, 354 U.S. 298, 327, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

19. *E. g.,* United States v. Bagby, 451 F.2d 920, 927 (9th Cir. 1971).

In this case, the majority has elevated the jury to a stature unrivaled in my legal experience. In the eyes of my Brothers, the jury was able to adapt itself to a variety of positions with amazing ease, and an uncanny depth of legal perception. I fully agree with the majority that the law requires us to presume that the jurors followed the instructions given them by the trial court. I can therefore discern a tinge of reason in my Brothers' disposition of Cook's contention concerning the hearsay evidence. Yet one must marvel at the jury's supposed ability at the same time, wholly to ignore the trial court's admittedly improper references concerning appellate review!

The jury's most remarkable feats, however, derived from its facility to divine the correct rule of law from nonexistent or incorrect instructions in the charge, while adhering to its presumed role of following the instructions that were given. The majority concedes that no instruction was given the jury that a verdict of guilty had to be supported by the unanimous agreement of the jurors as to Cook's guilt on at least one of the two allegedly perjurious statements. Nonetheless, my Brothers conclude that the jury was able to arrive at this conclusion on its own because of our court's prior holding in *Vitello,* a case involving distinct facts and stating a limitation upon the holding, which, as I have shown, make that decision wholly inapplicable to Cook's situation. Also, while the majority apparently recognizes some defectiveness in the "knowledge" instruction, it implicitly assumes that the jury could not have been improperly influenced by the incorrect statement of law. I cannot believe that the jury was properly guided as to the applicable law when the instructions that the jury presumably followed foreclosed all consideration of the principal ground of Cook's asserted defense.

I would reverse.