**The UNITED STATES of America, Plaintiff-Appellee,**

v.

**H. Philip CASH, Jr., Defendant-Appellant.**

**No. 74–1474.**

United States Court of Appeals, Ninth Circuit.

June 19, 1975.

Edward J. Bloom (argued), Palm Springs, Cal., for defendant-appellant.

Stuart W. Rudnick, Sp. Atty. (argued), Dept. of Justice, Los Angeles, Cal., for plaintiff-appellee.

## OPINION

Before ELY and WALLACE, Circuit Judges, and VOORHEES,* District Judge.

VOORHEES, District Judge:

This is an appeal from a judgment upon a jury verdict finding appellant guilty of having made false declarations before a United States grand jury in violation of Title 18 U.S.C. § 1623 (1970). We affirm.

Appellant's alleged false statements to the grand jury came during its investigation into an attempted sale of stolen United States Postal Service bearer bonds. The facts surrounding the attempted sale were these: In the latter part of July, 1973, Claude Scallion approached William B. Smart and asked Smart if he could assist Scallion in the sale of some securities. On July 31, 1972, Smart introduced Scallion to Jon Zimmer, a broker with Shearson, Hammill & Co., Inc., in Beverly Hills, California. Scallion delivered Postal Service bearer bonds having a substantial face value to Zimmer and represented that they were owned by a Jack Bishop of Bakersfield, California. (Jack Bishop was, however, only the purported seller. His name was used to conceal the identity of the real seller.) Thereafter, in a routine investigation Zimmer discovered that the bonds were stolen and notified the F.B.I. Pursuant to a request by the F.B.I., Zimmer informed Smart that the transaction had gone through and that a check was ready.

Smart, however, became concerned and contacted appellant, who was a friend and business associate, to find out whether appellant knew anyone in the government with whom he could check to see if there was anything wrong with the bonds. On August 1, 1972, appellant called and had a telephone conversation with Postal Inspector Gerald K. Jones. At appellant's trial Jones testified that appellant told him in that conversation that appellant had a wealthy friend in Bakersfield named Bishop; that Bishop was dying of cancer; that Bishop had placed something like $800,000 worth of postal bonds with Shearson, Hammill in Beverly Hills for sale; that following the placement of the bonds, the F.B.I. had been all "over the place"; that appellant had been a good friend of Bishop and did not want to see him get hurt; and that appellant asked Jones to check to determine if the bonds were stolen or if there were any difficulties with them. Jones testified that he thereafter checked through the Postal Service, found no indication that the bonds had been stolen, and so advised appellant.

Appellant was called before the grand jury on April 17, 1973, and asked questions about his knowledge of the attempted sale of the stolen bonds. On the basis of his testimony before the grand jury, appellant was indicted and charged with making false declarations before a grand jury in violation of Title 18 U.S.C. § 1623, which provides as follows:

---

* Honorable Donald S. Voorhees, United States District Judge, Western District of Washington, sitting by designation.

"Whoever under oath in any proceeding before . . . any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The pertinent portions of the indictment were as follows:

4. At the time and place aforesaid, H. PHILIP CASH, JR., while under oath, did knowingly declare before said Grand Jury with respect to the aforesaid material matter, as follows, concerning his knowledge of the purported owner of the aforesaid securities:

Q. You are certain you were never told who the the name of the seller was?

A. Yes, sir.

Q. You are certain you were never told the home town of the seller of the postal bonds?

A. That is correct, because I did not know it.

Q. You don't know it even to this day?

A. I still don't know it.

Q. You are absolutely certain without any possibility of error, you were never told the physical condition of the seller of the bonds?

A. No. I do not know. I do not know even today what the condition of this gentleman is.

Q. You are certain you were never told that in July or August of last year?

A. Yes, I am certain.

Q. If you are certain on all those three points, you are also certain, are you not, sir, that you could never have conveyed that knowledge to Mr. Jones.

A. I didn't know it, and I don't see how I could convey some information if I didn't know it.

\* \* \* \* \* \*

A. I talked to Mr. Jones and I asked him if he knew anything about this transaction. I gave him the information I had. I believe I told him about Shearson & Hammill, yes. And I believe he called me back an hour or so later at my residence, and gave me the information that he knew nothing about it. Now, that is all that took place. I do not know any Bishop. I do not know Bishop at all. I have no idea who he is.

5. The aforesaid declarations of H. PHILIP CASH, JR., as he then and there well knew and believed, were not true in that he did know that the bonds had been presented in the name of Bishop; that Bishop was purportedly from Bakersfield, California; and that Bishop was allegedly dying from cancer; and that all these matters had been the subject of a telephone conversation between H. PHILIP CASH, JR., and United States Postal Inspector Gerald Jones on or about August 1, 1972.

Of appellant's assignments of error, we need concern ourselves with only one: whether appellant's statements to the grand jury fall within the rules enunciated in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) and in *United States v. Cook,* 489 F.2d 286 (9th Cir. 1973) and 497 F.2d 753 (9th Cir. 1972).

In *Bronston* the defendant was sole owner of a motion picture production company, which petitioned for an arrangement with creditors under Ch. XI of the Bankruptcy Act. At a hearing held by a referee in bankruptcy to determine the nature and location of the company's assets, the following questions were asked of Bronston and answers given by him:

Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?

A. No, sir.

Q. Have you ever?

A. The company had an account there for about six months, in Zurich.

As a matter of fact Bronston did at one time have a personal Swiss bank account

but did not have one at the time he was testifying. His company did have a Swiss bank account at the time of Bronston's testimony.

On the basis of his answer to the second question Bronston was prosecuted for perjury.

The government argued that Bronston's answer to the second question implied that he never had a personal Swiss bank account and that his answer was therefore false. He was convicted and appealed.

In reversing the conviction, the Supreme Court stated at 409 U.S. 360, 93 S.Ct. 601:

"The cases support petitioner's position that the perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner— so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry."

*Bronston* was held by this court to be controlling in *United States v. Cook,* 489 F.2d 286 (9th Cir. 1973).

In *Cook* the appellant was indicted for perjury for allegedly having made false statements to a grand jury during an investigation into gambling and racketeering in Seattle. Cook was tried and convicted of having given false testimony in his answers to the following questions:

Q. Do you have any knowledge of law enforcement officers being paid by operators of gambling establishments?

A. No, I do not.

Q. You don't have any knowledge of anybody currently on the force who participated in shakedowns?

A. I do not.

His conviction was at first upheld by this court with Judge Ely dissenting.

In his dissent Judge Ely stated with particular reference to the first question:

"I do not think it proper to indict and prosecute an individual for perjury when the questions forming the basis of the charge are so vaguely and inarticulately phrased *by the interrogator* as to require the jury to probe the inner workings of the accused's mind to seek to ascertain which of several plausible meanings he attributed to the ambiguous inquiries when he gave the allegedly perjurious responses." (Emphasis in the original opinion)

Judge Ely went on to state:

". . . there is abundant judicial authority recognizing that the crucial inquiry in a perjury case is whether the accused believed his testimony to be true in light of the meaning that *he,* not his interrogator, attributed to the questions and answers." (Emphasis in the original opinion)

Shortly after the original and dissenting opinions in *Cook* were issued in slip sheet form, the Supreme Court handed down its opinion in *Bronston.* This court recalled its opinions in *Cook* and remanded the case to the District Court for consideration in light of *Bronston.* The District Court did not, however, disturb the original judgment of conviction, and a second appeal followed. On that appeal this court reversed the conviction and stated at 489 F.2d 287:

"After a careful analysis, we are unable to draw a meaningful distinction between the response to the ill phrased question before us, and the unresponsive answer to the question in *Bronston.* Fairly interpreted, *Bronston* stands for the precept that a perjury conviction cannot be based on answers which are literally true, even though false information is conveyed by implication."

Thereafter, this court directed the publication of the original opinions in *Cook* "believing that they, when reviewed in connection with *Bronston,* may be of some worth to those concerned with the law of perjury in the federal courts." Those opinions appear at 497 F.2d 753 (9th Cir. 1972).

In the instant case the questions asked of the appellant before the grand jury raise this problem: Did appellant under-

stand the word "seller" in the questions asked of him before the grand jury to mean "Jack Bishop" (the purported seller) or did he understand the word "seller" in those questions to mean that individual, unknown to him, who was the actual seller of the Postal Service Bonds? If appellant construed the word "seller" to mean Jack Bishop, his conviction must be affirmed. If he construed the word "seller" to mean that individual who was the actual seller of the bonds, then his conviction must be reversed.

A careful reading of the record has convinced us beyond any doubt that appellant knew that he was being asked about his knowledge of Jack Bishop when he was being questioned before the grand jury and that the word "seller" in the questions was understood by him to mean Jack Bishop.

Space forbids a detailing of all of the evidence that has persuaded us that appellant understood that he was being questioned before the grand jury about his knowledge of Jack Bishop. Our primary reliance is, however, upon the following:

1. At no time in the trial of this cause did appellant or his counsel contend that appellant did not know that he was being questioned about Jack Bishop before the grand jury. The whole thrust of the defense at trial was to pit the credibility of appellant against the credibility of Postal Inspector Jones and to try to persuade the jury that the testimony of appellant was to be believed and that that of Jones was to be rejected.

In the direct examination of appellant there was this exchange:

"Q. Mr. Cash, you have denied from the stand ever having discussed Jack Allen Bishop or any Bishop with Mr. Jones. Mr. Jones has testified that you did so. Do you have any reason or any explanation of why Mr. Jones would give the testimony he has given in this court?

A. No, other than Mr. Jones has got to be mistaken, misconstrued his facts, because none of this information was ever given to him on my telephone by myself."

2. At no point in his final argument did defense counsel argue that appellant did not understand the questions being asked of him before the grand jury. Rather, he urged the jury to prefer the testimony of his client to that of Postal Inspector Jones. One excerpt from that final argument is illustrative:

"As I see this case, Mr. Jones, the postal inspector, testified, 'Mr. Cash gave me this information about Mr. Bishop.' Mr. Cash said, 'No, I didn't.' You have got to believe one or the other of them, or you have got to conclude that Mr. Jones got his information from some other source, and in these famous destroyed notes confused something when he was writing it down."

3. The position taken by defense counsel throughout the trial is set forth most clearly in his motion to set aside the jury verdict and to enter judgment of acquittal in which he stated:

"The facts are very simple. Defendant before the grand jury repeatedly denied knowing any person by the name of Jack Bishop of Bakersfield. Defendant before this Court made equally unqualified and repeated denials."

4. Finally, in his opening brief on appeal in this court defense counsel stated:

"The Appellant Cash had a telephone conversation with government witness Jones.

"Cash had testified to the Grand Jury that he did not know one Jim Bishop. In the telephone conversation with government witness Jones, Jones testified that Cash prior to his Grand Jury testimony had told him a friend, one Bishop, had placed certain postal securities with brokers Shearson, Hammill and Co.

"This one inconsistent statement is the only basis of the perjury charge under 18 U.S.C. 1623, and the government witness Jones, the only witness to assert it. There was no corroborating

witness, fact or circumstance in the entire record."

And thereafter in his brief defense counsel stated:

"There is no evidence in the record that the Appellant Cash either did or did not know Bishop, and the only evidence in the record is the uncorroborated prior inconsistent statement, not under oath, allegedly made by Cash to the government witness Jones over the telephone."

By its verdict the jury obviously chose to believe Postal Inspector Jones and to disbelieve appellant. We believe that verdict to be amply supported by the evidence in this cause.

We have considered but found no merit in any of the other assignments of error made by appellant.

The judgment below is affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. The majority opinion cannot fairly be reconciled with the teaching of *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), and *United States v. Cook,* 489 F.2d 286 (9th Cir. 1973).[1]

Before a grand jury, Cash was asked whether he knew the name, home town, and physical condition of the "seller" of stolen postal bonds. Cash responded that he did not. It is beyond doubt that the questions asked of Cash were fairly susceptible of two interpretations. The questions can be read as inquiring about "Bishop," who, as the majority recognizes, was only the *purported* seller of the bonds,[2] but they can also be interpreted as asking about the *true* seller of the bonds, who apparently was someone other than Bishop.

The Government's evidence against Cash proved only that he knew, or knew of, Bishop. I have searched the record in vain for any proof whatsoever that Cash knew the identity of the *true* seller of the bonds. Since Cash could reasonably have interpreted the questions as being inquiries about the true seller, and since the Government offered no proof that Cash's answers, as they related to the true seller, were false, the judgment of conviction should be reversed.

After reviewing the transcript of the trial proceedings, however, the majority has concluded that Cash knew that the prosecutor was asking about Bishop, the purported seller. On this basis, the majority assumes that Cash's *answers* related to Bishop and concludes, therefore, that the Government proved that Cash committed perjury. I submit that the majority's logic is flawed.

Cash may have understood quite clearly that the Government's interrogator wanted answers about Bishop. But Cash may also have realized that the questions could fairly be interpreted as asking for information about the true seller. He might have chosen, therefore, to answer unresponsively, yet as to the true seller, truthfully.[3] Taking this very plausible view of the facts, the prosecution did not prove, beyond a reasonable doubt or otherwise, that Cash's answers were knowing falsehoods, an essential element of the alleged crime. *See* 18 U.S.C. § 1623 ("Whoever . . . *knowingly* makes any false material declaration . . . shall be fined . . . or imprisoned.").

In *Bronston,* the Supreme Court expressly noted that the answer for which Bronston was prosecuted might not have been "guileless" and that, in fact, the

---

1. See also my dissent to our court's first opinion in *Cook,* which is reported at 497 F.2d 753, 762 (9th Cir. 1972). The first *Cook* opinion was vacated by our second opinion, which was issued after the Supreme Court decided *Bronston* and is reported at 489 F.2d 286 (9th Cir. 1973).

2. Indeed, there was no evidence at trial to prove that "Jack Bishop" even existed. He may have been a purely fictional character.

3. I do not mean to imply that Cash did not know the identity of the true seller of the bonds. From the record, we cannot say whether he did or did not so know. My point is only that the prosecution did not prove, as was its burden to do so, that Cash knew the true seller's identity.

answer may have been "shrewdly calculated to evade." 409 U.S. at 362, 93 S.Ct. 595. Yet the Court reversed Bronston's conviction because the Government had not proved his answer to have been knowingly false. Like the majority has done here, the Second Circuit had examined the transcript of Bronston's trial and affirmed his conviction after concluding that he fully understood that his examiner was questioning him about his personal bank accounts, not those of his corporation. *United States v. Bronston,* 453 F.2d 555, 558 (2d Cir.), *rev'd,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).[4]

The majority does not base its disposition on a holding that Cash failed to raise the *Bronston-Cook* issue at his trial. Rather, my Brothers rely on Cash's use of another line of defense at trial, which was that Cash's own testimony was more credible than the testimony of Postal Inspector Jones, as support for their conclusion that Cash understood that the questions asked of him were specific inquiries about Bishop. Cash did, in fact, raise the *Bronston-Cook* issue at trial, and he has properly presented it, along with other issues, on this appeal. At trial, Cash first moved for a judgment of acquittal on the basis of the *Bronston-Cook* rationale, and then, when the motion was denied, he requested, unsuccessfully, a jury instruction embodying certain of the Supreme Court's language in *Bronston.* It is quite understandable that Cash's attorney failed to argue the *Bronston* theory to the jury. First, it was matter that properly should have been argued to the trial judge, as it was, after the prosecution had presented its evidence. Second, the judge refused Cash's requested instruction on the *Bronston* theory; consequently, the defense attorney was unjustifiably precluded from presenting the defense in summation.

I would reverse.

---

4. In *Bronston,* the Supreme Court strongly emphasized that a perjury prosecution is not the proper remedy for a witness's evasive and misleading, yet truthful, answers. The remedy must lie in increased acuity in the examiner's questions. 409 U.S. at 358–59, 360, 362, 93 S.Ct. 595. That remedy could have been applied so easily here. Had the Government's counsel asked the following questions, and had Cash continued to answer as he did, I would have no difficulty in voting to affirm Cash's conviction:

 1. Did you tell Postal Inspector Jones that you had a friend named Bishop?
 2. Did you tell Postal Inspector Jones that Bishop lived in Bakersfield, California?
 3. Did you tell Postal Inspector Jones that Bishop was dying of cancer?
 4. Did you tell Postal Inspector Jones that Bishop had placed something like $800,000 worth of postal bonds with Shearson, Hammill in Beverly Hills?

Obviously, there is a seminal danger in permitting perjury prosecutions to go forth on the basis of answers given to ambiguous questions. We should foreclose any prospect that an interrogator might choose intentionally to couch his questions in ambiguous terms in the hope that the answers might give rise to a plausible charge of perjury.