The UNITED STATES

v.

Patrick J. CLIFFORD.

No. 75–CR–654.

United States District Court,
E. D. New York.

Oct. 21, 1976.

David G. Trager, U. S. Atty., E.D.N.Y., Brooklyn, N.Y., Edward R. Korman, Thomas R. Pattison, Robert F. Katzberg, Asst. U. S. Attys., Brooklyn, N.Y., for the U. S.

Orans, Elsen, & Polstein, New York City, for Patrick Clifford; Gary P. Naftalis and Gary H. Greenberg, New York City, of counsel.

## MEMORANDUM and ORDER

COSTANTINO, District Judge.

After a jury trial, Patrick J. Clifford was convicted of one count of falsifying a material fact in a matter within the jurisdiction of the Office of the Comptroller of the Currency (18 U.S.C. § 1001).[1] More specifically that count of the indictment charged that:

> On or about February 19, 1971, within the Eastern District of New York, Patrick J. Clifford, the defendant, did knowingly and wilfully falsify a material fact in a matter within the jurisdiction of the

---

1. Clifford was one of three officers of the Security National Bank [hereinafter SNB] who, along with the SNB itself, were indicted in a 22 count indictment arising out of an alleged conspiracy to cause the bank to make illegal campaign contributions from 1966–1971. 18 U.S.C. §§ 610, 659, 1001. Other than Clifford's conviction for violating 18 U.S.C. § 1001, he and the other defendants were acquitted of all the other counts in the indictment. Although the original indictment was 22 counts, for purposes of clarification to the jury those counts alleging the same acts on the part of the individual defendants as on the part of the SNB were condensed. Thus, a 13 count indictment was read to the jury. The count on which the guilty verdict was rendered will be referred to as Count 13 in this opinion; it is Count 22 in the original indictment.

Office of the Comptroller of the Currency, an agency of the United States, to wit: that postage stamps had not been used to make political contributions by the SECURITY NATIONAL BANK, PATRICK J. CLIFFORD, the defendant, knowing such statement to be false. (Title 18, United States Code, Section 1001).

After all the evidence had been presented and prior to submission of the case to the jury, Clifford moved pursuant to Rule 29, Fed.R.Crim.P., for a judgment of acquittal on Count 13. This court reserved decision on the motion, noting at that time that it "is the weakest count in the whole indictment." (Tr. 4676–4677) After the jury returned its guilty verdict on Count 13 both sides submitted briefs on the reserved motion. For reasons which will be set out below, this court concludes that the jury verdict must be set aside, and a judgment of acquittal entered on Count 13.

### The Evidence

Since the evidence pertaining to Count 13 is not extensive, it will be helpful to examine it in its entirety. The main thrust of the indictment in this case was directed at an alleged conspiracy to wilfully violate 18 U.S.C. § 610 as well as at particular substantive violations of that section. The false statement alleged by Count 13 arose during the course of an investigation by the Office of the Comptroller of the Currency into these substantive violations.

That investigation was triggered by an anonymous letter [Exhibit 171] which was sent to the Chief National Bank Examiner in 1971. That letter, which is reproduced in full as Appendix A to this opinion contained the following relevant language:

You may be interested in a situation existing at Security National Bank (Huntington, New York) which appears to be a violation of Regulation "Q" (payment of funds for demand deposits).

Officers of the bank reaching a certain salary level were given a supplemental raise a couple of years ago, out of which they contributed $50.00 per pay for 24 pays ($100.00 per month). For some time, these kickbacks were in cash, the proceeds of which were used as inducements for demand deposit balances from local political officials. The usual manner of pay off was in regular U.S. postage stamps. Lately, the system has changed—checks are written by those bank officers, payable as directed by the bank, such as "Citizens for Goldberg."

In response to this letter Bank Examiner Edwin K. Langdon, Jr. interviewed Clifford on February 19, 1976. The following are the relevant excerpts from Mr. Langdon's testimony:

Q After you spoke with Mr. Van Horn, rather he spoke to you about the receipt of the anonymous letter, Exhibit 171, can you tell the ladies and gentlemen of the jury what, if anything, you did?

A I called Mr. Clifford at The Security National Bank and told him that our office had received an anonymous letter regarding political contributions and that I would like to see him at the bank to discuss the matter with him. (Tr. 2328)

Q Did there come a time when you met with Mr. Clifford?

A Yes, sir.

Q With regards to the anonymous letter? (Tr. 2329)

A Yes, sir.

Q Do you remember approximately what date that was, sir?

A February 21. (Tr. 2330)

Q Where did you meet Mr. Clifford?

A I met Mr. Clifford in his office in Huntington.

Q Was anybody else present other than yourself and Mr. Clifford?

A Yes, sir.

Q Who was that?

A Mr. Powell and Mr. Doud. [sic—Dowd]

Q David Doud? [sic]

A Yes.

Q Anybody else other than yourself, Mr. Clifford, Mr. Powell and Mr. Doud? [sic]

A No, sir.

Q Was there anybody else present from the Controller's office other than yourself?

A No, sir.

Q Did you bring anything with you that day, sir?

A I apparently brought some paper—I brought the anonymous letter, the copy, and apparently some paper to jot notes down with. (Tr. 2331)

Q Mr. Langdon, I want to focus on the meeting between yourself, Mr. Clifford, Mr. Doud [sic] and Mr. Powell. Would you tell the ladies and gentlemen of the jury as best you can recall it what happened and what was said.

A Mr. Clifford and Mr. Powell and Mr. Doud [sic] were shown the anonymous letter.

Q Did they read it, sir?

A Yes, sir.

Q Then what happened?

A They were told—When I gave it to them to read, I told them they could read it but not copy it.

Q Could you tell us what discussion took place after they read it?

A We went over each point in the anonymous letter, one by one. (Tr. 2332)

Q Exhibit 171, the writer alleges does he not that officers at the bank received supplemental raises out of which they were to contribute $100 a month, political contributions; is that correct, sir?

A Yes, sir.

Q Did you discuss that allegation with Mr. Clifford, Mr. Doud, [sic] and Mr. Powell?

A Yes, sir.

Q Can you tell us to the best of your recollection what you said and what if anything they said.

A We went over the allegation. I was told that officers of the bank did contribute, but it was on a strictly voluntary basis; that no raises were given for the purpose of making political contributions.

Q Who said that, sir?

A Mr. Clifford. (Tr. 2337)

Q When Mr. Clifford said that, did Mr. Doud [sic] say anything at that time?

A Not that I recall.

Q Did Mr. Powell say anything at that time?

A No sir.

Q The anonymous letter also alleges, does it not, that postage stamps were used to make contributions, isn't that correct, sir?

A Yes, sir.

Q Did you discuss that allegation?

A Yes, sir.

Q What if anything did they say?

A I asked if postage stamps had ever been used in the matter, and I was told, "No, not used in that matter."

Q Who told you that?

A Mr. Clifford.

Q Did Mr. Powell say anything with the respect to the postage stamps?

A No.

Q Did Mr. Doud [sic] say anything with respect to postage stamps?

A No, sir. (Tr. 2338)

Cross-Examination

Q The letter, did it not, related to a claim, unsigned handwritten, anonymous letter, about the political contributions program that the Security National Bank had in effect in 1971; is that correct?

A Yes, sir.

Q I think you testified on your direct examination that there was an allegation in a letter that the officers moneys that were contributed as part of the program were used to buy postage stamps; is that correct?

A Yes, sir.

Q You were told the officers money was not used to buy postage stamps?

MR. KATZBERG: Objection.

MR. NAFTALIS: This is cross-examination.

THE COURT: I'll allow it.

Q Is that correct?

A Yes, sir.

Q You were told—The answer is "yes"?

A Yes. (Tr. 2350)

Clifford testified as follows in regard to the meeting:

MR. CLIFFORD:

Q When we broke for lunch, I was questioning you as to a meeting you, Mr. Doud, [sic] and Mr. Powell had with Mr. Langdon. I asked you if there was any discussion with regard to postage stamps.

Could you tell us whether in that discussion, to the best of your knowledge, postage stamps were mentioned.

A I told Mr. Langdon that there were no postage stamps bought from the office[r]s, that $100 a month was received, and that I didn't handle the money and I asked Mr. Powell and Mr. Dowd in Mr. Langdon's presence, and they said, no. And the answer was "no."

None of the monies were used from the office[r]s to buy postage stamps. (Tr. 3334–5)

Q Now, the unanimous [sic] letter, which you read, also alleges, does it not, that postage stamps were used; is that correct?

A That is correct.

Q And there came a time, did there not, when Mr. Langdon asked you whether or not that was true?

A No, he did not ask me. He did not ask me the question. I think I was reading the letter and going down it with him. We spent a lot of time on the allegation as to Shea on postage stamps, and I answered and if I did not have the answer, I turned to Mr. Powell and turned to Mr. Dowd and said, to my knowledge, the officer contributions were not by postage stamps.

I said to Frank, "You have been handling the money. Do you know of any cases?"

And he said, "No," and Powell said, "No, I know of no cases," and that answer would be true today. (Tr. 3462–63)

Mr. David Dowd, one of Clifford's codefendants, testified as follows:

Q Do you recall when Mr. Langdon asked about postage stamps?

A Right.

Q Remember that, sir?

A Yes, sir.

Q He asked whether or not the bank made contributions in postage stamps?

A No, I think he said "Were postage stamps bought by the officers?

Q Didn't ask whether or not the bank itself bought postage stamps?

A I don't think so.

Q What did Mr. Clifford say to that?

A I believe he said, "No," because I know he asked me and he asked Mr. Powell and I know that I said, no, they had not. (Tr. 4132)

After the meeting was over, Langdon filed a report with Mr. C. M. VanHorn, his superior. The full text of the letter appears as Appendix B. In relevant part it is as follows:

As per your instructions, I visited the above bank on February 19, 1971 to review the anonymous letter regarding political contributions with bank management. My copy of the letter is returned herein. The bank did not request a copy of the letter, nor was a copy left with them.

The matter was discussed with Chairman Patrick J. Clifford, Executive Vice President Frank B. Powell, and Senior Vice President David J. Dowd. The bank reviewed the letter, and the following information was developed:

The bank's practice is to request that officers with administrative responsibilities who make more than $20,000 per year, are requested on a voluntary basis to contribute approximately $100 per month from their own funds for political dinners. Mr. Clifford stated that in no way are these officers reimbursed by the

bank. He stated that not all officers who were requested to make donations made them, and gave as an example President Travers, who attends many such political affairs, and refuses to give any money. Mr. Clifford stated that the bank's attorney, William Shea, has advised him that of all the ways banks directly or indirectly support political affairs, that the means used now is the least objectionable from a legal standpoint. Mr. Clifford stated that the practice of having a deposit account in the bank for the donated funds was discontinued last year. He further stated that at no time had contributions been in the form of stamps.

Additional evidence introduced at trial makes it clear that the writer of the anonymous letter was mistaken in alleging that "the usual manner of pay-offs was in postage stamps." It is undisputed that none of the money contributed as part of the officers' contribution program was ever used to buy stamps. However, in at least one incident in the year prior to the commencement of the officers' contribution program, Clifford admittedly requested that George Barrie (a bank officer) send $500 worth of postage stamps to Arthur Levitt's reelection campaign. It is on the basis of this direct contribution of postage stamps that the government contends Clifford's false statement conviction should be upheld. Clifford argues that a judgment of acquittal must be entered because (1) there was insufficient evidence to reasonably conclude that the statement alleged was in fact made, (2) at most there was ambiguity as to the meaning of the questions and answers, and (3) the alleged false statement was not material. Since this court concludes that a judgment of acquittal must be entered based on either of Clifford's first two contentions, it is not necessary to examine the materiality issue.

\* \* \*

[1, 2] The rule in this circuit is that when examining a Rule 29 motion, if the judge "concludes that either of . . . two results, a reasonable doubt or no reasonable doubt, is fairly possible," he must let the jury verdict stand. *United States v. Taylor,* 464 F.2d 240–43 (2d Cir., 1972). On the other hand the jury may not be permitted to convict based on "pure speculation". and if the evidence is such that a reasonable juryman must necessarily have a reasonable doubt, the trial judge should direct a verdict of acquittal. *United States v. Taylor, supra,* 464 F.2d at 243.

The initial problem in this case is the lack of a stenographic transcript which would indicate exactly what was said by Clifford and Langdon. The absence of a verbatim record of the interview raises serious difficulties in light of the Supreme Court's decision in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

In *Bronston,* the Court overturned a perjury conviction (under 18 U.S.C. § 1621) where the answer given was unresponsive on its face and untrue by negative implication, but was nevertheless literally true. The Court refused to allow the jury to "engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner." 409 U.S. at 359, 93 S.Ct. at 600.

If the *Bronston* holding is applied to § 1001 cases the lack of proof in this case as to exactly what Mr. Clifford said in relation to postage stamps appears fatal. Accordingly this court must determine the extent to which *Bronston* should be applied to this § 1001 prosecution. While it is true that the elements of a perjury conviction and of a § 1001 conviction are similar, they are not identical in scope. *See, e. g., United States v. Stephens,* 315 F.Supp. 1008, 1010, fn. 2[2] (W.D., Okl.,1970). It is also true that

---

**2.** This court must respectfully disagree, however, with that portion of the *Stephens* footnote which suggests that the government does not have to prove that the maker did not believe the statement to be true in a § 1001 prosecution. That statement does not accurately represent the law in this circuit. *Cf. United States v. Adler,* 380 F.2d 917 (2d Cir., 1967), cert. denied, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1968) (statement was false and defendant knew it was false); *United States v. McCue,* 301 F.2d 452 (2d Cir., 1962), *cert denied,* 370

the courts in this circuit have followed the Supreme Court lead in giving § 1001 an expansive interpretation. *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *United States v. Adler,* 380 F.2d 917 (2d Cir., 1967); cert. denied, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. McCue,* 301 F.2d 452 (2d Cir., 1962), *cert. denied,* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962).

■ Nevertheless, despite differences in scope, the test for determining the falsity of a statement under both the perjury and the false statements sections appears to be the same. For instance, in *United States v. Diogo,* 320 F.2d 898 (2d Cir., 1963), which involved a conviction for false statements, the Court of Appeals relied on the test for ambiguity as stated in a perjury case, *United States v. Lattimore,* 127 F.Supp. 405 (D.D.C., 1955), *aff'd* per curiam by an equally divided court, 98 U.S.App.D.C. 77, 232 F.2d 334 (1955).

One court has already concluded that the *Bronston* rationale should be applied to prosecutions under § 1001. *See United States v. Ehrlichman,* 379 F.Supp. 291 (D.D.C., 1974.) In *Ehrlichman,* the court set aside a jury verdict of guilty and instead entered a judgment of acquittal, noting:

> In the instant case, defendant Ehrlichman was faced with the difficult task of arguing that his statements to the F.B.I. were literally true on the sole basis of the agent's sketchy notes, which do not purport to be a verbatim record of either the questions or the answers at issue and

which were not even shown to him until shortly before trial.

379 F.Supp. at 292.[3].

■ This court declines to adopt a rule that would mandate dismissal of a § 1001 count as a matter of law in the absence of a verbatim transcript or a written statement. Nevertheless, in view of the circumstances present in this case the absence of a transcript of what was said places Clifford in the same untenable situation that Ehrlichman faced in trying to argue that his statements were literally true.

In order to illustrate the impossible task Clifford faced in trying to prove the literal truthfulness of his statements it is merely necessary to examine the conflicting evidence presented by the government itself. As previously set forth, Mr. Langdon testified that

> I asked if postage stamps had ever been used in the matter, and I was told, "No, not used in that matter." (Tr. 2238)

In his report, however, Mr. Langdon asserts that Mr. Clifford "stated that at no time had contributions ever been in the form of stamps." It is clear that the two versions presented by the government of the statements alleged to have been made by Clifford are vastly different, not only in form, but in substance, especially if a determination of literal-truthfulness *vel non* is to be made.

Assuming that *Marzani v. United States,* 83 U.S.App.D.C. 78, 168 F.2d 133 (1948) (false statement statute can be applied even when there is no stenographic transcript of the false statement), *aff'd* per curiam by an equally divided court, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948) retains any viability

U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962) (the false statement must be made knowingly and wilfully); *United States v. Diogo,* 320 F.2d 898–90 (2d Cir., 1963) (question was whether government had established that statements made by each defendant were false, and that the statements were known by defendants to be false when they were made). The only exception is where the defendants acts with conscious disregard or conscious avoidance of the truth of the statement. *United States v. Egenberg,* 441 F.2d 441 (2d Cir., 1971), *cert. denied,*

404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971).

**3.** Other courts have extended *Bronston* to prosecutions under 18 U.S.C. § 1623, a statute whose operative language ("knowingly makes any false material declaration") is similar to § 1001. *See, e. g., United States v. Razzaia,* 370 F.Supp. 577 (D., Conn., 1973); *United States v. Esposito,* 358 F.Supp. 1032 (N.D., Ill., 1973).

in light of *Bronston* and *Ehrlichman,* it is distinguishable in that the conflicting versions of the testimony in *Marzani* were presented by witnesses for the prosecution and the defense. In this case, while the government's evidence is similarly disputed by the testimony of the defendants, it is also inconsistent in and of itself.

In *United States v. Razzaia,* 370 F.Supp. 577 (D., Conn., 1973), defendant had testified before a grand jury investigating gambling law violations that he had not carried a notebook nor a brown paper envelope into a certain apartment. At trial an F.B.I. agent testifying on behalf of the government testified that he saw the defendant on the day in question carrying a black notebook and a manila envelope. Defendant testified that he had carried a clipboard and some small brown envelopes which he normally carried in his capacity as a commercial driver. In setting aside a jury verdict of guilty under § 1623, Judge Newman stated:

> If it were a crime to carry a notebook, then, on proper evidence, a jury verdict could stand despite a defendant's assertion that what he actually carried was a similar but slightly different item. In a prosecution for such a possessory offense the evidence would be expected to be less equivocal than the agent's testimony here. For instance, the agent acknowledged that the object the defendant was carrying could have been a clipboard, as defendant claimed. But this is a prosecution for false swearing, and in such a prosecution the careful use of words becomes important. If a more extensive basis had been laid for these questions, a

perjury conviction might have been upheld despite the elusive distinctions between a notebook and a clipboard, or between large and small envelopes. Under the circumstances here, however, these distinctions are not the stuff of which perjury convictions can be made. 370 F.Supp. at 579; *Cf. United States v. Esposito,* 358 F.Supp. 1032 (N.D., Ill., 1973).

■ In the case at bar, no substantive charges were brought based on the postage stamp contribution. The sole charge relating to the stamps was the alleged false statement violation. Thus, the words become crucial. But there was no basis, other than pure speculation upon which a reasonable juror could determine what question was asked and what response was given. Without knowing the question asked or answer given, a finding that a false statement was made is unreasonable.[4]

It may be that under certain circumstances a prosecution for false statements may be sustained despite lack of proof as to the exact words used. However, under the circumstances here present, the absence of a transcript requires that the guilty verdict be set aside.

### Ambiguity

There is an alternative and equally valid basis for setting aside the jury verdict in this case. Even assuming *arguendo* that the government had proved what was said, the verdict must be set aside since the government's proof indicates that at best, the questions and answers were ambiguous.

The government relies heavily on Langdon's report (Appendix B) in arguing that the verdict should not be set aside. Specifi-

---

4.  *Cf. United States v. Lambert,* 501 F.2d 943, 948 (5th Cir., 1974), an *en banc* opinion, in which the 5th Circuit reversed a § 1001 conviction because of the variance between the statement charged in the instrument and the proof adduced at trial:

    > In the false statement case, the inquiry is three-fold: Did the defendant say what the indictment charges him with saying? If he did, does it depart from the truth? Was it material? The starting point for everything is the statement. Once the defendant is informed what it is he is claimed to have said,

    > then he can marshal his evidence tending to show that he did not make the utterance charged, or that it is true, or that it was not material. If the threshold information given is not correct, the defendant is hampered in defending on all three grounds, since the starting point for the latter two is the content of his alleged statement.

    In the instant case the two possible versions of the statement upon which the jury was called to speculate were not merely different in form; as noted above they were vastly different in substance.

cally the government points to the following excerpt:

> "He [Clifford] further stated that at no time had the contributions been in the form of stamps."

The government's reliance on this excerpt is misplaced. For one thing the report does not in any way purport to be a verbatim transcript of what Clifford said. It is nothing more than a summary in Langdon's own words of the substance of his discussion with Clifford, Dowd and Powell.

█ Moreover, as Judge Kaufman has pointed out, a perjury prosecution may not be based on a statement lifted out of context, the true meaning of which has thereby been perverted. *United States v. Geller*, 154 F.Supp. 727, 730 (S.D.N.Y., 1957); *cf. United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir., 1976), *cert. denied* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). ("A defense to a charge of perjury may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole.") In *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274, 1283 (1975) the Court of Appeals for the District of Columbia noted:

> The issue was whether Chapin's version of the question, in context, was reasonable enough that a jury would be left to speculate on which meaning of the question Chapin had in mind and so would be unable to determine whether he had knowingly answered the question falsely. [citation omitted] The placing of the question is important in this connection.

When viewed in context, the excerpt relied upon by the government clearly refers to the officers' contribution program. Langdon's investigation was prompted by the anonymous letter dealing with the officers' contribution program. In fact, as the report states, the purpose of the interview was to "review the anonymous letter." As he testified at trial concerning his meeting with Clifford, "We went over each point in the anonymous letter, one by one" (Tr. 2332). Langdon's report deals entirely with the officers' program. There is nothing in the report that would indicate that anything but the officers' program was discussed.

At trial Langdon testified as to his recollection of the pertinent question and answer:

> I asked if postage stamps had ever been used in the matter, and I was told, "No, not used in that matter." (Tr. 2338)

This testimony is clearly the best available record of the interview.[5] It is the only proof offered by the government which indicates the specific question and answer upon which this verdict was based. If the false statement charge is to be sustained, it would have to be done so based on this testimony.

The testimony becomes more crucial in view of the fact that the evidence is undisputed that the only time postage stamps were used in connection with a contribution by the SNB was at a time before the officers' program came into existence. Thus if Clifford's denial was limited to the officers' program it was literally truthful and not a proper basis for a conviction. *United States v. Bronston, supra*. If it was a denial that postage stamps had ever been used in any way, shape or manner by the SNB to make political contributions then it would be a false statement and the verdict would have to stand.

Realizing the importance of this testimony, both the government and the defendant have generously provided this court with their own interpretations. The government in its brief underlines "ever" for emphasis; Clifford underlines "the matter" and "that matter" for emphasis.

In this court's opinion no amount of emphasizing the word "ever" will change the fact that the scope of the question was severely limited by the words "the matter." In light of the purpose of Langdon's visit and the focus of the discussion, it seems

---

5. Langdon has since destroyed his notes of the interview.

clear that "the matter" refers to the officers' contribution program.

■ This court, however, need not weigh the two interpretations offered in order to decide which is more likely. In construing Clifford's statement, this court must look to the meaning intended by Clifford himself, rather than to the interpretation of the statement which the Office of the Comptroller of the Currency did *in fact* make, or even to the interpretation which that office might reasonably have made. *See United States v. Diogo,* 320 F.2d 898, 905–06 (2d Cir., 1963).

In *United States v. Wall,* 371 F.2d 398 (6th Cir., 1967) defendant was convicted of perjury based on her grand jury testimony that she had never "been on trips" with Mr. X. There was no evidence that defendant had travelled anywhere with Mr. X, but there was evidence that she was with Mr. X at his motel room in Miami Beach. In reversing the conviction, the Court of Appeals said:

> The trouble with this case is that the question upon which the perjury charge was based, was inarticulately phrased, and, as admitted by the prosecution, was susceptible of two different interpretations. In our opinion, no charge of perjury can be based upon an answer to such a question.
>
> · · · · ·
>
> There was no evidence to show what the question meant to Mrs. Wall when she answered it. In the absence of such evidence, no determination could be made as to the falsity of her answer. The evidence was insufficient to support the conviction. The District Court erred in denying the motion for judgment of acquittal.

371 F.2d at 399–400

■ Here Clifford contends that the question and answer related solely to the officers' contribution program. This is not the type of case where defendant offers a contrived, hypertechnical or lame interpretation of his answer solely for purposes of trial. *Cf. United States v. Andrews,* 370

F.Supp. 365 (D., Conn., 1974). In view of the circumstances here present, Clifford's interpretation of his answer seems at least as reasonable, (indeed it appears more so) as the government's interpretation. While the question of what a defendant meant when he made the statement will normally be for the jury, when, as in this case, "no evidence is presented on the question, it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct." *United States v. Diogo, supra* at 907. *Cf. United States v. Steinhilber,* 484 F.2d 386 (8th Cir., 1973) (ordering entry of judgment of acquittal on grounds that the government had failed to negative defendant's interpretation of the terms "being constructed" and "now being built.")

■ Assuming *arguendo* that a violation of § 1001 could be based upon the ambiguous question and answer in this case, the government would have to prove that (a) Langdon used the words with the meaning suggested by the government, and that (b) Clifford knew (1) the sense in which Langdon used the words and (2) nevertheless gave an answer which he knew to be false to the question as thus put in the sense thus intended. *See Van Liew v. United States,* 321 F.2d 674, 682–3 (5th Cir., 1963). In attempting to meet this burden, the government relies on a meeting between Clifford, George Barrie, Frank Powell and Robert Dowd (another bank officer) which allegedly took place shortly after Clifford's meeting with Langdon. Mr. Barrie testified as follows:

Q  Tell us what was said?

A  Mr. Clifford indicated that a letter, anonymous letter, was written to the Controller of the Currency regarding the contributions. He asked if I wrote it. I denied having written it nor did I know who did.

Q  Was stamps discussed at that time?

MR. NAFTALIS: Objection.

THE COURT: He may answer.

A  Yes, that was discussed.

Q  Who asked you that?

A  Mr. Clifford asked about that.

Q And what was the response as to that?

A The same—as with the letter, I knew nothing about it. (Tr. 1966–67)

There is nothing in this testimony from which a reasonable juror could base the § 1001 conviction. The context of this conversation clearly dealt with the officers' contribution program. Furthermore, assuming *arguendo* that a reasonable juror might somehow infer from Barrie's ambiguous testimony that Clifford remembered the stamps contribution, the government has nevertheless failed to meet the burden set out in *Van Liew, supra*. This testimony in no way sheds any light whatsoever on the meaning Langdon intended by his question;[6] nor does it indicate what Clifford's interpretation of Langdon's question was. For example, even if there was evidence (which there is not) indicating that Langdon by his question meant to include all contributions *ever* made by the bank and even if Clifford remembered the stamp contribution, if Clifford reasonably understood Langdon's question to relate *only* to contributions made during the course of the officers' contribution program then the § 1001 count could not stand.[7] The hazard in concluding otherwise is aptly illustrated by Judge Ely's cogent dissent in *United States v. Cook*, 497 F.2d 753 (9th Cir., 1972).[8]

In *Cook,* the defendant had responded in the negative to a question as to whether he had any knowledge of law enforcement officers "being paid by" operators of gambling establishments. The evidence indicated that payments had ceased two years before the question was asked. The majority concluded that the question should be viewed as an inquiry into past events. Judge Ely wrote:

Perhaps the most persuasive indication of the indefensibility of the majority's position is the simple fact that had Cook responded to the question in the affirmative, there could have been no doubt, in light of the uncontroverted evidence, that the payments had ceased, that such an answer would have been false. Cook was indeed "up the creek" without any semblance of a paddle when posed this question, for regardless of his response, he was subjecting himself to a perjury prosecution.

In this case, had Clifford answered "yes" to the ambiguous question posed by Langdon, and had the government then chosen to interpret the question as relating solely to the officers' contribution program, the answer would have been false in view of the uncontradicted evidence that contributions from that program were never made in the form of stamps. Thus, whichever way he answered Langdon's question, Clifford was subjecting himself to § 1001 prosecution, subject to the government's after-the-fact interpretation. Clearly such a result cannot be countenanced. There must be some evidence as to what the question meant *at the time* it was asked.

The government, however, has failed to negative the interpretation offered by Clifford, *viz.,* that the questions and answers related solely to the officers' contribution program. The failure to negative a reasonable (even likely) interpretation of an ambiguous question constitutes a separate and alternative ground for the court's conclusion that the verdict of guilty must be set

---

6. Surprisingly, the government never asked Langdon to explain what he intended by his question.

7. "If a question is vague or ambiguous when asked and evokes an untruthful answer born of misunderstanding, as opposed to a willful and false material declaration, then a perjury charge cannot lie." *United States v. Ceccerelli,* 350 F.Supp. 475, 478 (W.D., Pa., 1972)

8. Shortly after the opinion in *Cook* was filed, the 9th Circuit recalled its decision and re-

manded to the District Court for reconsideration in light of *Bronston v. United States, supra.* The District Court did not overturn the judgment of conviction and defendant appealed again to the Court of Appeals. On the second appeal, the Court of Appeals reversed the conviction, 489 F.2d 286 (9th Cir., 1973) noting that *Bronston* "essentially tracked" Judge Ely's original dissenting opinion.

aside and a judgment of acquittal entered in its stead.

Accordingly, it is ordered that the verdict of guilty on Count 13 be set aside and a judgment of acquittal entered.

## APPENDIX A

Chief National Bank Examiner
Federal Reserve Bank Building—5th Floor
33 Liberty Street
New York, New York   10045

Dear Sir:

You may be interested in a situation existing at Security National Bank (Huntington, New York) which appears to be a violation of Regulation "Q" (payment of funds for demand deposits).

Officers of the bank reaching a certain salary level were given a supplemental raise a couple of years ago, out of which they contribute $50.00 per pay for 24 pays ($100.00 per month). For some time, these kickbacks were in cash, the proceeds of which were used as inducements for demand deposit balances from local political officials. The usual manner of pay off was in regular U. S. postage stamps. Lately, the system has been changed—checks are written by those bank officers, payable as directed by the bank, such as "Citizens For Goldberg". One batch of such checks was payable to a Director (William Shea), possibly tying in with his legal fees to the bank, for the recent proxy fight with Abacus Fund over the Royal National merger. Here, there is no Regulation "Q" violation, but it seems to be contrary to honest accounting, as Shea's fees wind up being paid out of officer's salaries rather than Legal Fees.

This information is for your office's use, and I trust it will be of help to you in your efforts to eliminate abuses of good general banking practices.

A Friend

## APPENDIX  B

### THE ADMINISTRATOR OF NATIONAL BANKS

Office of the
Comptroller of the Currency
NATIONAL BANK EXAMINER

Mr. C. M. Van Horn
Regional Administrator of National Banks

Second National Bank Region
33 Liberty Street, Room 520
New York, New York   10005

Re:  Security National Bank
Huntington, New York

Dear Mr. Van Horn:

As per your instructions, I visited the above bank on February 19, 1971 to review the anonymous letter regarding political contributions with bank management. My copy of the letter is returned herein. The bank did not request a copy of the letter, nor was a copy left with them.

The matter was discussed with Chairman Patrick J. Clifford, Executive Vice President Frank B. Powell, and Senior Vice President David J. Dowd. The bank reviewed the letter, and the following information was developed:

The bank's practice is to request that officers with administrative responsibilities who make more than $20,000 per year, are requested on a voluntary basis to contribute approximately $100 per month from their own funds for political dinners. Mr. Clifford stated that in no way are these officers reimbursed by the bank. He stated that not all officers who were requested to make donations made them, and gave as an example President Travers who attends many such political affairs, and refuses to give any money. Mr. Clifford stated that the bank's attorney, William Shea, has advised him that of all the ways banks directly or indirectly support political affairs, that the means used now is the least objectionable from a legal standpoint. Mr. Clifford stated that the practice of having a deposit account in the bank for the donated funds was discontinued last year. He further stated that at no time had contributions been in the form of stamps. Regarding the comments about Mr. Shea receiving funds, which the letter related to legal fees and the Royal National Bank proxy fight, Mr. Clifford stated this was entirely false. First of all, he stated that Mr. Shea's fee regarding the Royal merger was $25,000. He stated that this was very reasonable, and that Mr. Shea could have been entitled to $100,000 on the basis of time and effort spent. As regards the checks payable to Mr. Shea, Mr. Clifford stated that the officers had spent money early last year for political affairs, and that when election time came, the officers were unable to raise $15,000 needed for political dinners. Mr. Clifford said that Mr. Shea loaned $15,000 of his own money to cover these expenses. Mr. Dowd at this point produced a list of bank officers who had been requested to

start repaying the loan to Mr. Shea. Some of the officers on the list contributed sums ranging from $140 to $300, while others gave no money at all. Mr. Dowd stated that these donations were part of the $100 per month arrangement, and not extra donations. The aggregate of these personal contributions totalled $5,000, which was repaid to Mr. Shea, leaving an open balance of $10,000. Mr. Clifford said that the balance would be repaid, even if he and Mr. Powell have to give $2,500 each out of their own funds.

Mr. Powell stated that he recognized the handwriting on the anonymous letter as that of an officer on Mr. Dowd's list of bank officers who had been requested to repay Mr. Shea. Mr. Clifford said that no action would be taken against the officer involved.

Sincerely,

/s/ Edwin K. Langdon, Jr.
Senior National Bank Examiner